[L. A. No. 3285. Department Two.—February 24, 1913.]

In the Matter of the Estate of HENRY B. GLEASON, Deceased. LIDA E. CORBIN, Appellant, v. EVA MILDRED GLEASON, Respondent.

WILL—MENTAL INCOMPETENCY—UNDUE INFLUENCE — EVIDENCE — CONDUCT AND STATEMENTS OF TESTATOR SHORTLY AFTER EXECUTING WILL.—On a contest of a will on the ground of the mental incompetency of the testator and the undue influence of his wife, evidence that about ten or fifteen minutes after the will had been fully executed, the testator returned to the office of the person who had drafted it in an apparently nervous condition and in a state of physical collapse, and of statements then made by him to the effect that matters would have been extremely uncomfortable at his home if the will had not been properly executed, was competent solely upon the issue as to the testator's mental condition, and was incompetent to prove the undue influence, and an instruction so limiting its effect was properly given.

ID.—CONDUCT AND STATEMENTS NOT PART OF RES GESTAE.—The conduct and utterances of the testator on such occasion were not part of the *res gestae* of the execution of the will, so as to render evidence thereof competent on the issue of undue influence, and the mere fact that but a trifling period of time elapsed between the testamentary act and this occurrence, does not render the evidence admissible for such purpose.

ID.—RES GESTAE DEFINED.—The *res gestae* are those circumstances which are the undesigned incidents of particular litigated acts, and are

admissible where illustrative of such acts. These incidents may be separated from the act by lapse of time more or less appreciable. Their sole distinguishing feature is that they should be necessary incidents of the litigated act in the sense that they are part of the immediate preparations for, or emanations from, such acts, and are not produced by the calculated policy of the actors. They must stand in immediate causal relation to the act, a relation not broken by individual wariness seeking to manufacture evidence for itself. Declarations which are the immediate accompaniments of an act, their immediateness being tested by closeness, not of time but by causal relation, are admissible as part of the *res gestae*.

ID.—FACTS CONSTITUTING UNDUE INFLUENCE—EVIDENCE OF—DECLARATIONS OF TESTATOR.—In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such undue influence has been exercised, but also that it has produced an effect upon the mind of the testator, by which the will is not the expression of his own desires. The external facts constituting the exercise of undue influence must be established by other evidence than the declarations of the testator. His declarations are incompetent to show either that the influence was exercised, or that it affected his actions, and are inadmissible, except as they may illustrate his mental state, and give a picture of the condition of his mind contemporaneous with the declarations themselves.

ID.—IMMATERIAL ERROR—INSUFFICIENCY OF EVIDENCE OF UNDUE INFLUENCE.—Even if such subsequent conduct and statements of the testator were properly part of the *res gestae* of the execution of the will, the error of the trial court in refusing to admit the evidence thereof on the issue of undue influence was immaterial, when the other evidence in the case fell far short of establishing that the will was the result of undue influence exerted upon the testator by his wife in such manner as improperly to influence him in the making of the will. In the present case, such other evidence is held insufficient to show that the will was the result of the wife's undue influence.

ID.—UNDUE INFLUENCE MUST OPERATE AT TIME WILL WAS MADE.—A duly executed will cannot be set aside on the ground of undue influence, unless there be proof of a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.

APPEAL from a judgment of the Superior Court of Los Angeles County admitting a will to probate, and from an order refusing a new trial. . Frederick W. Houser, Judge.

The facts are stated in the opinion of the court.

G. P. Adams, J. H. Peters, and Newman Jones, for Appellant.

E. B. Drake, for Respondent.

MELVIN, J.—The will of Henry B. Gleason, deceased, was admitted to probate July 13, 1911. By it he left ten dollars to his sister, Lida E. Corbin, appellant herein, and the rest of his property, amounting in value to about forty thousand dollars, to his wife, Eva Mildred Gleason. Early in July, 1911, the sister of the deceased Gleason filed a contest to said will, praying revocation of the probate thereof on the grounds, among others, that "the said deceased was induced to execute the said will by reason of the undue influence of the said Eva Mildred Gleason, exercised and exerted by her over and upon him, and that the said will was extorted from him by the said Eva Mildred Gleason by threats of personal violence, and was executed by him under fear of the same, and that at the time of the making of the said will and for a long time prior thereto, he was not of sound mind and memory, and was not competent to make a will." The questions of fact involved were tried before a jury and a determination in favor of the validity of the instrument having been made, judgment was entered accordingly adverse to the prayer of the sister's petition. From said judgment and from an order denying her motion for a new trial the contestant appeals. The will was drawn by W. S. Lang, a notary public, who had known Mr. Gleason for some years. Testator went alone to the office of Mr. Lang; told the notary that he wanted to make a will; stated his wishes in relation thereto; and the will was prepared by the notary. Mr. Gleason requested that in addition to the signatures of the two witnesses, he desired Mr. Lang to acknowledge the instrument as a notary. This was accordingly done, and that the will was executed with proper formality is not questioned. Of the manner and apparent testamentary competency of Mr. Gleason at the time of the execution of the will, the notary testified:

"At the time he signed the will his condition was apparently normal, or otherwise I would not have taken his acknowledgment. I saw nothing at that time to indicate to my mind at all that he was not perfectly normal and sane.

He told me how to make the will and who to will the property to.

"Q. Who did he tell you to will the property to? A. I remember the wife and sister. He gave his sister $10, if I remember right. After the will was written I think he read it. I am quite sure he did.

"Q. Was there anything to indicate that he was acting under any undue influence that you noticed at that time? A. No, not that I noticed.

"Q. You would never have taken his acknowledgment as a notary public if there had been, would you? A. Unquestionably I would not."

Further describing the conduct of the testator, the notary was permitted to testify, over objection, that Mr. Gleason returned to his office within ten or fifteen minutes after the execution of the will; that testator seemed to be in a state of nervous collapse; that he "fell into a rocking chair"; and that a conversation ensued between him and the notary. This may be best described in the language of the record. Witness Lang being questioned by Mr. Adams, testified as follows:

"He sat down in a chair and made the remark: 'Oh, hell.' I did not pay any attention to it at that time and continued to read, and again he remarked: 'Oh, hell, that paper,' and so I looked up and he was looking at me and I said 'What paper do you mean?' 'That will.' So I thought I would ask him questions—

"Q. (By Mr. Adams.) You mean he said 'that will?' That was his answer, 'that will.' I said: 'I suppose you knew, Mr. Gleason, it was not necessary to acknowledge that at all. That was rather an unusual proceeding.' 'I know,' he said, 'but I had to do it. I had to do it right or hell would pop at home; I could not stay there.' And that is about all that was said on that particular point. He frequently says, 'Oh, hell,' or 'damn it.'

"Q. Repeat any further conversation you had with him at that time. A. I asked him—I said: 'Why, Mr. Gleason, who did you marry?' He said: 'I will be damned if I know.' He said, ' I got drunk, and they said I was married; that is all I know about it.' That was about all that was said at that time."

Another witness named Clemens corroborated Mr. Lang in his account of the testator's nervous condition. In the charge to the jury the court gave the following instruction:

"You are instructed that while there was testimony admitted in this case from the witnesses, William S. Lang and Nicholas Clemens, that shortly after the making of the will in controversy, but after it was signed, witnessed, and delivered, that the decedent appeared to be nervous and in more or less of a physical collapse, and which evidence contained a purported conversation or statement at that time and place by decedent, yet you are now cautioned that such testimony was admitted alone upon the theory, and was competent only for the purpose, of being considered by you upon the question of the soundness or unsoundness of the mind of the testator, the said Henry B. Gleason, and was not competent to prove, nor was it admitted for the purpose of, nor can you consider the same, in any wise as establishing undue influence on the part of Eva Mildred Gleason, and was not competent for that purpose, and you should not consider it for that purpose."

The limitation in the above instruction of the scope of the testimony of the two witnesses is the appellant's sole assignment of error, and her entire reliance for a reversal of the judgment rests upon the contention that the conduct and utterance of the testator were a part of the *res gestae*.

Undoubtedly the rule regarding the matters which are admissible as parts of the *res gestae* has been somewhat liberally construed by courts in later years. It is also true that declarations when admissible as parts of the *res gestae* need not necessarily be absolutely contemporaneous with the main event. Appellant contends that the test is not the time of the declarations with reference to the main event, but the opportunity for reflection and intention which may have been given to the testator, or, as Professor Wigmore expresses it: "The utterance must have been before there has been time to contrive and misrepresent, i. e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. This limitation is in practice the subject of most of the rulings." (Wigmore on Evidence, par. 1750.) Conceding this to be the general rule, we cannot say that the lapse of from ten to fifteen minutes was not, under the circumstances here given, sufficient to exclude the

evidence as part of the *res gestae* and as applicable to the issue of undue influence. In the first place, such declarations are not looked upon with favor by the courts. Many statements of the rule might be cited, but a typical and oft-quoted one is that of Colt, J., in *Shailer* v. *Bumstead,* 99 Mass. 119:

"That the instrument which contains the testamentary disposition of a competent person, executed freely and with all requisite legal formalities, must stand as the only evidence of such disposal, is generally conceded. Such a will is not to be controlled in its plain meaning by evidence of verbal statements inconsistent with it; nor impaired in its validity and effect by afterthoughts or changes in the wishes or purposes of the maker, however distinctly asserted. It is to be revoked only by some formal written instrument, some intentional act of destruction or cancellation, or such change of circumstances as amounts in law to a revocation. Any invasion of this rule opens the way to fraud and perjury; promotes controversy; destroys to a greater or less degree that security which should be afforded to the exercise of the power to control the succession to one's property after death."

The rule with reference to declarations in such cases in this and many other jurisdictions has long been settled and is well expressed in *Kirkpatrick* v. *Jenkins,* 96 Tenn. 89, [33 S. W. 820]: "We think the great weight of authority and of reason, is to the effect that subsequent declarations of an alleged testator may be considered by a jury upon an issue of mental capacity, but that they cannot be considered upon an issue of undue influence, unless there be independent proof indicating the presence of undue influence, and then only to show a condition of mind susceptible to such influence, and the effect thereof upon the testamentary act." This court has formulated the rule even more forcibly. *In re Calkins,* 112 Cal. 301, [44 Pac. 578], contains this language in the opinion: "In order to establish that a will has been executed under undue influence, it is necessary to show, not only that such undue influence has been exercised, but also that it has produced an effect upon the mind of the testator, by which the will which he executes is not the expression of his own desires. The external facts constituting the exercise of undue influence must be established by other evidence than the declarations of the testator. His declarations are incompetent

to show either that the influence was exercised, or that it affected his actions, and are inadmissible, except as they may illustrate his mental state, and give a picture of the condition of his mind contemporaneous with the declarations themselves. Whenever the condition of the mind is a fact which it is desirable to prove, it may be established by such evidence as is competent for that purpose. The mental condition of an individual is made manifest to others by his statements, declarations, conversations, as well as by his conduct, and, when the state of a testator's mind at the time of executing the will, is the fact to be shown, his contemporaneous declarations or statements furnish the most satisfactory evidence of that fact. His statement of the effect that an act or suggestion of another produced upon him at some previous time is, however, only hearsay, while the statement of his feeling or disposition at the time of making the statement is but the expression in words of his condition at that time, and, so far as it produces a picture thereof, is admissible." (See, also, *Estate of Ricks*, 160 Cal. 485, [117 Pac. 539]; *Estate of Kilborn*, 162 Cal. 11, [120 Pac. 762]; *Estate of Gregory*, 133 Cal. 131, [65 Pac. 315].) Unless, therefore, we are compelled to regard the utterances and demeanor of the testator as parts of the *res gestae*, evidence relating to them should be declared inadmissible according to a rule most firmly established in this state.

Definitions of *res gestae* are as numerous as prescriptions for the cure of rheumatism and generally about as useful. One accurate definition is quoted with approval in 7 Words and Phrases, 6130, as follows: "The *res gestae* is defined by Wharton in his work on Evidence, 258, 267, 'as those circumstances which are the undesigned incidents of particular litigated acts, and are admissible where illustrative of such acts. These incidents may be separated from the act by lapse of time more or less appreciable. Their sole distinguishing feature is that they should be necessary incidents of the litigated act—necessary in this sense: that they are part of the immediate preparations for, or emanations from, such acts, and are not produced by the calculated policy of the actors. In other words, they must stand in immediate causal relation to the act—a relation not broken by individual wariness seeking to manufacture evidence for itself. Therefore declara-

tions which are the immediate accompaniments of an act are admissible as part of the *res gestae;* remembering that immediateness is tested by closeness, not of time but by causal relation, as just explained.' '' Tested by this rule, we cannot say that the conduct and conversation of the testator here reviewed must be considered a part of the *res gestae.* The mere fact that but a trifling period of time elapsed between the testamentary act and the circumstances related by witnesses Lang and Clemens, does not make the evidence admissible for all purposes. It appears from the record that Henry B. Gleason was subject to sick spells, relief from which was obtained only by the use of morphine hypodermically injected. It may well have been that his agitation and his remarks on the occasion of his second visit to the notary's office were caused by illness, or morphine, or a combination of the two. His agitation may have resulted from any one of a dozen causes, and his remarks when analyzed, do not amount even to a statement that his wife had coerced him in the matter of the disposition of his property by will. He described no act or command or threat of his wife; but said he ''had to do it right,'' and expressed the conclusion that matters would have been extremely uncomfortable at home if the instrument had not been properly executed. His statements were not even declarations of past occurrences. That which he said was merely the expression of his opinion regarding a past occurrence, and was no more a part of the *res gestae* because it was uttered a few minutes after the execution of his will, than it would have been if spoken a month later. (*Lissak* v. *Crocker Estate Co.,* 119 Cal. 444, [51 Pac. 688]; *Durkee* v. *Central Pacific R. R. Co.,* 69 Cal. 534, [58 Am. Rep. 562, 11 Pac. 130]; *Luman* v. *Golden A. C. M. Co.,* 140 Cal. 709, [74 Pac. 307]; *Boone* v. *Oakland Transit Co.,* 139 Cal. 492, [73 Pac. 243]; *Waldeck & Co.* v. *Pacific Coast S. S. Co.,* 2 Cal. App. 169, [83 Pac. 158].)

But even if the court had erred in refusing to rule that the conduct and statements of the testator subsequent to the preparation and execution of the will constituted parts of the *res gestae,* we would not look upon the error as material, because the evidence in the case fell far short of establishing contestant's allegation that the will was the result of undue influence exerted upon the testator by Eva Mildred Gleason

in such manner as improperly to influence him in the making of his will. The contestant's only material evidence at the trial beyond that which we have discussed was the following, which we quote from the transcript:

"Other evidence was given on behalf of the plaintiff to the effect that the decedent at the time of his marriage to the defendant was sixty years of age; that she at the time was twenty-two years of age; that the decedent's first wife, to whom he was devotedly attached, died less than a year prior to his marriage to the defendant, after a happy married life of more than thirty years with him; that the defendant first married November 23, 1903; her husband was killed April 19, 1904; that she married again September 1, 1904; was divorced from the second husband December 5, 1906; married the decedent June 5, 1907, having known him but six months; that he had numerous sick spells and his only relief at such times was by use of morphine hypodermically injected; that the will in controversy was taken by the defendant a few hours after its execution to Mr. Pennington, one of the witnesses to the said instrument, and she showed it to him and asked him if he had signed it as a witness, and thereafter on the same day she placed it in a safe deposit box at the bank; that the defendant married again a few months after the death of the decedent Gleason, and this latest marriage was thereafter annulled at her instance; that the decedent, Gleason, died June 22, 1910, seven weeks after the execution of the alleged will, and that the estate left by him was and is appraised at about $40,000, all of which, with the exception of ten dollars bequeathed to his sister, the said Lida E. Corbin, is by the terms of the will in question devised and bequeathed to the said defendant Eva Mildred Gleason."

The court seems to have been very liberal toward contestant in the admission of testimony. This, of course, was proper, in view of the several issues involved, but we fail to see what relevancy the numerous marriages of Eva Mildred Gleason could possibly have to the questions involved in the contest, and this is most emphatically true with reference to the marital ventures of the lady after she became the widow Gleason. Surely her influence over her former spouse, whatever it may have been, had then ceased. While Gleason's marriage to a young woman who had been once widowed and

once divorced might possibly have indicated that he was reckless, it would not necessarily suggest either lack of testamentary capacity or subjection to the will of his new wife. Her early custody of the will and her prompt inquiry regarding its execution might have been important, if there were other evidence that she had sought by threats or subtler means improperly to influence her husband, but there is no such showing beyond the conduct and statements of the testator which we have discussed above, and which were totally inadequate to establish undue influence. The unbroken rule in this state is that the courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of "a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made." (*Estate of Carithers*, 156 Cal. 428, [105 Pac. 130]; *Estate of Lavinburg*, 161 Cal. 543, [119 Pac. 915]; *Estate of Kilborn*, 162 Cal. 11, [120 Pac. 762].)

The judgment and order are affirmed.

Henshaw, J., and Lorigan, J., concurred.

Hearing in Bank denied.