[Civ. No. 2139.   Third Appellate District.—July 24, 1920.]

# MARY J. PLEASANTS, Administratrix, etc., Respondent, v. ISAAC J. HANSON et al., Appellants.

[1] DEEDS—PARENT TO CHILD — FRAUD OR UNDUE INFLUENCE — PRE-SUMPTION—PRIMA FACIE CASE—BURDEN OF PROOF.—While there is no presumption that a deed by a parent conveying property to a child is invalid or void and, when such a deed is attacked on the ground of fraud or undue influence, the burden is cast upon the parent to prove such fraud or undue influence, when a *prima facie* case of fraud or undue influence in the procurement of the conveyance is made by the parent, it then rests with the defendant to produce sufficient evidence to so weaken or destroy the effect of the evidence presented by the plaintiff as. that the latter's evidence cannot longer stand as establishing a *prima facie* case either of fraud or undue influence, or both.

[2] ID.—PREFERENCE OF ONE CHILD TO EXCLUSION OF OTHERS—AB-SENCE OF FRAUD OR UNDUE INFLUENCE—DUTY OF COURTS.—Where property is obtained without a valuable consideration by a child from its parent, particularly where one child, to the exclusion of other children of the parent, receives from the latter, without a valuable consideration, a very large part of the patrimony to which all the children would in equal shares succeed under the law of descent or succession in case of intestacy, the courts are required to scan or examine the transaction scrutinizingly and to require the defendant, where fraud or undue influence is *prima-facie* established as against him in the transaction, to make very satisfactory proof that the showing on the part of the plaintiff is wholly without foundation for its support.

[3] ID.—ACTION TO SET ASIDE—ULTIMATE FACT—PROOF BY CIRCUM-STANTIAL EVIDENCE.—In an action to set aside a deed made by an aged parent to her son to the exclusion of her other adult children on the grounds that the same was procured from the grantor by the grantee through imposition upon the former or misrepresentation and undue influence, the ultimate fact may be established by circumstantial evidence; and in this action, while there was no direct testimony showing coercion or the exercise of undue influence by the grantee, the appellate court could not say, as a matter of law, that the findings upon which the judgment rested

1.  Presumption and burden of proof as to undue influence respecting gifts *inter vivos* from parent to child, notes, 17 **Ann. Cas.** 989; **Ann. Cas.** 1915D, 711; **Ann. Cas.** 1918B, 457; 35 **L. R. A. (N. S.)** 944.

were not so fortified evidentially as to render them entirely immune from successful attack.

[4] ID.—CONVERSATION WITH GRANTOR AFTER EXECUTION—ADMISSION AGAINST INTEREST—EVIDENCE.—In an action to set aside a deed made by an aged parent to her son on the grounds that the same was procured from the grantor by the grantee through the imposition upon the former of misrepresentation and undue influence, evidence of a conversation between the grantor and the grantee, after the deed had been executed and delivered, in which the former accused the latter of misrepresentation in procuring the execution and delivery of the deed, which accusation the latter did not at the time deny, is admissible.

APPEAL from a judgment of the Superior Court of Yolo County. W. A. Anderson, Judge. Affirmed.

The facts are stated in the opinion of the court.

A. G. Bailey and Grant & Bailey for Appellants.

Hugh K. McKevitt, L. Seidenberg and E. E. Gaddis for Respondent.

HART, J.—Action to have decreed null and void and to set aside a certain deed of conveyance on the grounds that the same was procured from the grantor by the grantee through imposition upon the former of misrepresentation and undue influence. Plaintiff was awarded judgment from which the defendants prosecute this appeal.

The second amended complaint alleges and the court finds: That plaintiff's intestate, who died on the fifth day of December, 1915, was, on the fifth day of August, 1915, and for many years prior thereto, the owner in fee simple and in the actual and peaceable possession of a certain lot of land (the real property in controversy here), situated in the town of Winters, Yolo County, of the reasonable value of two thousand dollars, and also was the owner and in like possession of another lot of land in said town, of the value of six hundred dollars; that the total value of all the property, real and personal, owned by her on said day was two thousand six hundred dollars; that said Mary J. Hanson was, on the day mentioned, the mother of five living adult children, exclusive of the said Isaac J. Hanson, and that all of said five children were for many years immediately prior

to said day in constant and confidential association with said deceased, and that said five children had for many years prior to her death assisted her financially and in other ways, "and said Isaac J. Hanson had done nothing in any way toward assisting her for more than twenty-eight years immediately prior to her death"; that said Mary J. Hanson on the day aforesaid, and for some time prior thereto and thereafter, was infirm physically, being at said time suffering from ailments of the limbs and severe attacks of heart trouble, and then more than seventy-five years of age and required to be confined to her bed for long periods of time immediately prior to the day last mentioned on account of said years and illness, and that by reason of her age and the ailments referred to, the deceased, on the said fifth day of August, 1915, was incapacitated from doing any business or entering into any contracts whatever; that the said Isaac J. Hanson, knowing his said mother's incapacity, infirmity, and disability, and for the purpose of defrauding her, procured her, by certain false and fraudulent representations, to execute a deed whereby she conveyed to him the tract of land in question; that the defendant Lillian Hanson, wife of said Isaac J. Hanson, was at the time mentioned herself the owner of real estate of the value of one hundred thousand dollars, standing in her own name, and that said Isaac J. Hanson falsely represented to his mother that unless she conveyed to him the lot of land in question, his wife, the said Lillian Hanson, would desert him and turn him out into the world penniless, as he was without money or property of any character in his own right; that said Isaac J. Hanson represented to his mother that he could not return to the defendant, Lillian Hanson, unless his said mother executed said instrument of conveyance and that his said wife, Lillian Hanson, had sent him to his mother, Mary J. Hanson, to demand that she (said Mary J. Hanson) execute said conveyance; that notwithstanding the representations so made by said Isaac J. Hanson, the said Mary J. Hanson still refused to sign or execute the instrument conveying the land in dispute to said Isaac J. Hanson and that the latter thereupon became "greatly excited and red in the face and shook said instrument at Mary J. Hanson and cried: 'Oh, Ma, you have to sign this paper or I shall be a pauper' "; that said Mary J. Hanson, being weak in body and mind and by

reason of the maternal love she bore said defendant, Isaac
J. Hanson, and fearing that he would be deserted by his
said wife, Lillian Hanson, if she (Mary J. Hanson) refused
to sign said instrument, and "being alone at said time and
having no separate or independent advice, and believing all
and each of said representations to be true and by reason
of said representations and wholly and only on account
thereof, executed said instrument in writing and acknowl-
edged the execution thereof and delivered the same to the
defendant Isaac J. Hanson"; that each and all of said rep-
resentations were false and defendant, Isaac J. Hanson,
knew each and all of said representations to be false when
he made them to said Mary J. Hanson and that he made said
representations for the purpose of influencing said Mary J.
Hanson to sign said instrument; that there was not then,
and there never was, any consideration given for said instru-
ment; that defendant, Isaac J. Hanson, is, and was at said
time, a scheming and calculating business man and had prop-
erty of the value of more than fifty thousand dollars; that
said Mary J. Hanson at all times herein mentioned implicitly
trusted said defendant, Isaac J. Hanson, and reposed abso-
lute confidence as to all matters in said defendant, Isaac J.
Hanson, he being her oldest living child, and that her con-
fidence was such and her belief in said Isaac J. Hanson was
so strong and implicit that she would have executed and
signed any papers presented to her by him for her signa-
ture, and that the said deed, referred to in the complaint as
having been signed by said Mary J. Hanson for said Isaac
J. Hanson, was in fact signed for him by her by and be-
cause of the confidence she had in him as hereinbefore set
forth.

The complaint contains a second count or cause of action,
setting forth the fact of the physical infirmities of Mary J.
Hanson and the facts respecting the alleged misrepresenta-
tions made by Isaac J. Hanson to the deceased, as alleged and
set forth in the first count, and upon these facts bases the
allegation that Mary J. Hanson was induced to execute and
deliver to said Isaac J. Hanson the deed in question through
undue influence; and the court also found accordingly.

The most important question submitted here for decision
is whether the evidence supports the findings of the court, to
which we reply, *in limine,* that tested by the principles of

law which govern in a case of this character, the evidence appears to be sufficient to have justified the decision. At any rate, as we must view the evidence, it amply supports the findings.

[1]   While it is true that there is no presumption that a deed by a parent conveying property to a child is invalid or void and that, when such a deed is attacked on the ground of fraud or undue influence, the burden is cast upon the parent to prove such fraud or undue influence, it is also true that when a *prima facie* case of fraud or undue influence in the procurement of the conveyance is made by the parent, it then rests with the donee (defendant) to produce sufficient evidence to so weaken or destroy the effect of the evidence presented by the plaintiff as that the latter's evidence cannot longer stand as establishing a *prima facie* case either of fraud or undue influence or both. He (the defendant) may do this by showing in a proper way that the evidence of the plaintiff tending to show fraud or undue influence is not credible or for sufficient reasons not to be relied upon.   [2]   But in cases of this class—that is, where property is obtained without a valuable consideration by a child from its parent—intrinsic circumstances may exist which call for the strictest scrutiny of such transactions. This observation has emphatic application to those cases where one child, to the exclusion of other children of the parent, receives from the latter, without a valuable consideration, a very large part of the patrimony to which all the children would in equal shares succeed under the law of descent or succession in case of intestacy.   This rule follows from the fact that the relation existing between parent and child, although strictly not fiduciary, is, naturally, one of confidence and trust, and, since, therefore, that would be, upon its face, an unnatural transaction which would result in one of a number of children receiving from the parent as a gift the larger portion of the latter's estate, thus excluding the other children from the enjoyment of benefits growing out of the parent's estate to which naturally they would be entitled, it is not a harsh or unreasonable rule which requires the courts, on an issue as to whether the favored child had obtained the gift through the free and voluntary act of the parent or through fraud or undue influence, to scan or examine the transaction scrutinizingly or

require the defendant, where fraud or undue influence is *prima facie* established as against the donee in the transaction, to make very satisfactory proof that the showing on the part of the plaintiff is wholly without foundation for its support.

The instant case, in the facts as indicated by the complaint and the court's findings and, as we shall later see, as shown by the evidence, finds almost a complete counterpart in the case of *Nobles* v. *Hutton*, 7 Cal. App. 14 [93 Pac. 289]. The following language taken from 7 Cal. App., pages 20 and 21, [93 Pac. 292] of the opinion in that case has peculiarly cogent application to the present case: "But the relation of parent and child, where business transactions are carried on between them, is the source of the very highest considerations of confidence and trust. Confidence in such a case originates in and proceeds from natural laws, and, generally speaking, is innate and an essential part of the nature of both, for in whom could a parent repose a greater degree of confidence than in him to whom has been directly transmitted his own blood, and over whom he has exercised parental dominion and discipline from infancy to matured manhood. So, when a son, dealing with his parent with regard to the latter's property, gains an advantage or obtains title to such property without adequate or any consideration, the transaction should, upon principles of equity and fair dealing, be scanned with the strictest scrutiny. And, *a fortiori*, should such transaction be examined circumspectly when the parent is, as here shown to be, aged and mentally infirm, even though not altogether incompetent, and where there are other children, for the exclusion of whom from the parent's estate no reasonable account is given or apparent. The books are full of cases illustrating the application of the principle as thus stated."

In *Comstock* v. *Comstock*, 57 Barb. (N. Y.) 453, a case in which an aged parent conveyed property to her son and the deed set aside, the court said: "It is a well-settled rule of equity jurisprudence, that all gifts, contracts, or benefits, from a principal to one occupying a fiduciary or confidential relation to him, are constructively fraudulent and void. The court, in such cases, acts upon the principle that if confidence is reposed it must be faithfully acted upon; if influence is acquired it must be kept free from the taint of

selfish interest, and cunning and overreaching bargains. In this class of cases there is often found some intermixture of deceit, imposition or overreaching advantage or other mark of positive or direct fraud. But the principle upon which courts of equity act in regard thereto stands 'independent of any such ingredient, upon a motive of general public policy.' Among the relations subject to the foregoing rule are those of parent and child, attorney and client, and principal and agent." (See, also, *Robins* v. *Hope,* 57 Cal. 493, 497; *Bacon* v. *Soule,* 19 Cal. App. 428, 434, [126 Pac. 384]; *Cox* v. *Schneer,* 172 Cal. 371, 378, [156 Pac. 509]; 2 Jones on Evidence, ed. of 1913, sec. 190.)

The evidence supporting the allegations of the complaint may be briefly summarized. It may first be stated that this evidence comes mainly from members of the family of deceased.

The deceased, at the time of her death in the month of December, 1915, was of the age of seventy-six years, and the deed in question was executed and delivered by her to the defendant, Isaac J. Hanson, on the sixth day of August, 1915, or approximately four months prior to the date of the passing of deceased. For a long period of time prior and down to the date of her death, deceased had been and was a sufferer from a serious heart affection, which, with other physical ailments, of themselves of a less serious nature, often confined her to her bed for certain periods of time of varying duration. The deceased was a woman naturally of strong intellectuality and had, in her time, been a devout lover of good book reading or literature of the higher order. The effect, however, of the long siege of physical ailments and like disability was to impair in no small or insignificant degree the natural strength of her mentality and thus to render her power of self-will much less marked and positive than it had been when, in her earlier years, she was in the enjoyment of excellent physical health. In other words, she had, from her long, uninterrupted period of physical illness, grown noticeably feeble not only physically but also mentally, and, while it is not here claimed that she was wholly incompetent to transact ordinary matters of business with some degree of intelligence and judgment, it nevertheless appears to be reasonably inferable from the evidence that her condition, men-

tally, at and for some time immediately preceding the time
at which transpired the transaction from which this contro-
versy arises, was such by reason of her long years of physical
suffering and her venerable years, that she could the more
easily or the more readily than when she was in the enjoy-
ment of her normal physical health be influenced by those in
whom naturally or for other reasons she reposed confidence
and trust.

The evidence further shows, and as to this there is no
dispute, that, shortly after the disastrous and never-to-be
forgotten earthquake and fire in the city of San Francisco
in April, 1906, the deceased purchased the property in dis-
pute and another lot in the town of Winters, Yolo County;
that there were residence structures thereon, either erected
by herself or those preceding her in ownership of the lots,
and that, though she realized from both pieces of said prop-
erties at times an income in the way of rents, the same were
scarcely sufficient to maintain her and that, for a period of
ten years immediately preceding her demise, she resided,
during alternate periods, with her three married daughters,
Mrs. Pleasants and Mrs. Willis, of Winters, and Mrs. Olds,
of Piedmont, Alameda County. It further appears that
these daughters thus took care of their mother and received
and asked for no compensation as in return for the per-
formance of that service.

At the time of the transaction upon which this action is
founded, Mrs. Mary J. Hanson was a widow, her husband
having died in the year 1890, and she had five living chil-
dren, to wit: The defendant Isaac J. Hanson, Edwin J.
Hanson, and the three daughters above named. Isaac J.
Hanson was a married man and had lived in Brockton and
Boston, in the state of Massachusetts, for something like
twenty-eight years before the date of the execution and de-
livery of the deed in controversy. During that period of
time, Isaac J. Hanson contributed nothing to the support of
his mother, except that, upon an occasion when he was on a
visit to California, he bought her a pair of shoes, for which
he paid ten dollars; and here we may well interpose that,
while Isaac testified in chief that he had from time to time
.remitted small amounts to his mother from his eastern
home, he admitted, on cross-examination, that the sums so
sent to his mother were in payment by installments of a

loan of one hundred dollars with which his mother had previously accommodated him.

The evidence without controversy shows that the relations existing between the deceased and her three daughters and her son, Edwin J. Hanson, were always and mutually of the most affectionate character—that is, that she uniformly entertained for them and they for her that reciprocal love and fondness which may naturally be assumed to exist as a general rule between parent and child.

Edwin J. Hanson testified that he worked in San Francisco for some five or six years and down to the time that he entered college; that, during a part of that period of time, he was engaged in the milk business; that during said time he sent and gave to his mother all his earnings to be used by her for her support, and that he continued to help his mother until the time he started to college.

As to the circumstances under which the deed in question was made by the deceased, it may be stated generally that there is testimony supporting the allegations of the complaint and the findings that Isaac J. Hanson represented to his mother that his (Isaac's) wife was wealthy in her own right; that he himself was the possessor of no means; that his wife was persistently insistent that Isaac should obtain from his mother a conveyance of the particular piece of property in dispute; that his wife had said to him that, unless he did obtain a deed to said property, she (the wife) would desert him and send him out into the world penniless; that the deceased, moved by these representations and the incessant importunities of Isaac that she convey to him said property and thus save him from becoming "a pauper," finally yielded thereto against her own convictions, and so consented to and did execute and deliver to Isaac the conveyance.

Edwin J. Hanson testified that Isaac, when on a visit to California, either in the year 1914 or 1915, on one occasion, in the city of San Francisco, stated to him (Edwin) that he (Isaac) and his wife were jointly worth one hundred thousand dollars—that is, that each was worth the sum of fifty thousand dollars.

Mrs. Pleasants testified that Isaac and his wife, having gone to the state of Washington in the year 1914 to attend to some property matters they had in that state, passed

through California on their way to their eastern home; that they went directly to Winters, and inquired about the deceased and as to where she was then living. Mrs. Pleasants replied that deceased was then in Piedmont, stopping with Howard Willis during the absence from home of the latter's parents, to which Isaac interrogatively retorted: "Oh, she's alone, is she?" Mrs. Pleasants answered affirmatively, and shortly thereafter Isaac and his wife left Winters and went to Piedmont; that it was upon this visit to his mother (July, 1915) that Isaac succeeded in prevailing upon his mother to make the conveyance to him of the property in controversy.

Harvey Olds, a grandson of deceased by her daughter of that surname, testified that, on the evening of the departure of Isaac and his wife for their home in the east, a farewell gathering of the family was had at the family home of the Old's; that he (the witness), during the evening, had occasion to go into the kitchen, where the deceased and Isaac were together and alone and engaged in conversation; that he overheard his grandmother, "in excited tones," say to Isaac: "Why did you make me believe that Lillian would leave you?" And he said: "Oh, what's the difference; don't worry";. and then she said: "I will worry; you had no right to tell me that Lillian would leave you unless this property was deeded over to you"; and he said: 'Oh, forget it, Ma; it's all right; don't say anything about it; you will come out all right'; or something like that."

[3] Thus there has been presented, in synoptical fashion, sufficient of the evidence introduced in support of the charge that the conveyance under attack was obtained by Isaac by the exercise of undue influence upon his mother to show that this court cannot justly hold, as a matter of law, that the findings upon which the judgment rests are not so fortified evidentially as to render them entirely immune from successful attack.

It is true that there is no direct testimony showing coercion or the exercise of undue influence by Isaac in the procurement of the deed. But there can be no successful impeachment of the legal proposition that, in a case of this character no less than in any other case, the ultimate fact may be established by circumstantial evidence. Indeed, in this case, in considering the evidence with a view of determining its logical effect, the court was authorized to, and

doubtless did, take into account the general atmosphere, so to speak, or, in other words, the general surroundings, of the controversy as they were opened up by the proofs, and as to this consideration, these facts were singularly significant: That the deceased and her children who were with and near her nearly all their lives were always on excellent terms and that said children at all times manifested and practiced in their treatment of their mother the love and affection which alone spring from filial duty, and that the deceased in full measure reciprocated that love and affection; that said children, for years, contributed to her support, and otherwise gave her that care and attention in the helplessness of her venerable years and physical disability which it is the natural duty of all children to bestow upon their parents similarly circumstanced; that Isaac had been away from her for many years, had not during those years companionized with her, had in a sense or to an extent thus become estranged from her, although quite naturally, she still bore for him a mother's love, and that, unlike his brother and sisters, had contributed nothing toward her support, maintenance, and care; that, finally, and as a most rational conclusion from all those facts, no sane or sound reason existed or at least, none such was shown, why, to the exclusion of her other children, she should have given the bulk of her estate or by far the larger portion thereof to Isaac.

It is to be conceded that the evidence, as it appears in the record, does not appear to show as clearly or satisfactorily as such a fact should be shown where it is relied upon to vitiate a deed of conveyance or a will, that the deceased, at the time of the making of the deed in question, was mentally incompetent to transact business, but the evidence as we have shown, is undisputed that she had been for a long time prior to that transaction in poor physical health, being at times required to remain in her bed, and upon the whole evidence it was for the trial court to determine whether or not her mental condition had been so affected as the result of her physical sufferings as to have rendered her more tractable and, therefore, more susceptible to external or extrinsic pressure or influences than she would have been under normal circumstances or conditions and so, under the force of persistent importunity by one for whom naturally

she entertained a strong sentiment of affection and love and in whom consequently she reposed confidence, would be likely to perform or do some act which, if left wholly to her own volition with reference thereto, she would not have done or performed. And we doubt not that the situation as developed by the evidence was such as to have warranted the court in finding that, in her weakened physical condition, the deceased would the more readily believe the representation made by Isaac that his wife would desert and leave him penniless if he did not succeed in obtaining the conveyance in question, and that, so believing and actuated by a mother's love, would the more readily accede to his demand for the conveyance. The conclusion would naturally follow that the procurement of the deed by Isaac was the result of the prosecution by him of undue pressure upon the donor, which, of course, means that undue influence was exercised by Isaac upon his mother to induce her to give him the property.

The defendants, it is true, gave an entirely different version of the transaction from that presented by the witnesses for the plaintiff. But it was for the trial court to determine the weight of all the testimony, *pro* and *con*, received into the record, and finally to say whether the defendants succeeded in overcoming or repelling what clearly appears to be a good *prima facie* case of undue influence made by the plaintiff.

The appellants have cited a number of cases, some from this and some from other jurisdictions, which they vigorously contend fit the facts of this case as they view them and so, they insist, establish the legal invalidity of the findings and the judgment. Among the cases so cited is that of *Boardman* v. *Lorentzen,* 155 Wis. 566, [52 L. R. A. (N. S.) 476, 145 N. W. 750], in the opinion in which the supreme court of Wisconsin said: "There must be shown a subject unquestionably susceptible to undue influence, either as the result of old age, mental weakness, or both; also some clear evidence of opportunity, and a disposition on the part of the beneficiary to exercise such influence, in order to raise the presumption of such exercise, and call upon the defendant to so far weaken it, at least, as to destroy its efficiency to establish the ultimate fact. It must follow that to warrant such a result as was reached here as to

undue influence, the fact of susceptibility to such influence must be left at the end of the trial unquestionably established, and the disposition to exercise such influence established by clear evidence.''

That was a case in which the father, aged and infirm mentally and physically, transferred his small estate to his son-in-law in consideration of an agreement on the part of Lorentzen, the donee, and his wife (daughter of the donor) that they would care for and support him during the few remaining years of his life. The children of the donor, other than the married daughter above referred to, had not lived with or in any way cared for the donor for over twenty-five years, while Mrs. Lorentzen, who was his youngest daughter, remained and lived with him until after her mother's death and down to the day that she was married to Lorentzen. It is plain that that case is, so far as the facts are concerned, wholly different from this. Indeed, it is the reverse of this case, since here the donee was the only child of the five of the deceased who had not been with, or to any extent contributed to the support of, his mother, while the other children had always lived near and contributed to her support and otherwise ministered to her wants.

The California cases named by appellants as supporting their position as to the question whether the evidence in this case is sufficient to sustain the finding of undue influence are: *In re Calkins,* 112 Cal. 296, 302, [44 Pac. 577]; *In re Kaufman,* 117 Cal. 288, 296, [59 Am. St. Rep. 179, 49 Pac. 192]; *Estate of Donovan,* 140 Cal. 390, 396, [73 Pac. 1081]; *Estate of Gleason,* 164 Cal. 756, 762, [130 Pac. 872]. An examination of these cases and a comparison of them with the case at bar, however, will at once disclose to the mind that there is a clear distinction between them founded in the facts. It is not regarded necessary to review said cases herein for the purpose of determining the verity of this statement.

[4] The last and only other point made by the appellants is that, over their objection, the court erroneously permitted the witness, Harvey Olds, to relate the conversation he overheard between the deceased and Isaac J. Hanson, in the kitchen of the Olds' home, and to which conversation reference is above made. It is claimed that the ruling was erroneous under the doctrine of the case of *Estate of Glea-*

*son,* 164 Cal. 756, [130 Pac. 872]. But this claim is not well founded. In the Gleason case, the declarations objected to were by the deceased to a third party and not in the presence of the beneficiaries under her testament. The court therein held, as all the cases hold, that the declarations of a decedent which contravene the provisions or terms of a testament previously made by him are not admissible as evidence of undue influence having been used to induce him to make the will; but that, where the testamentary incapacity of the testator is an issue and sought to be established, any declarations he may have made, before or subsequent to the testamentary act, tending or reasonably having a tendency to establish that he was of unsound mind at the time he executed the testamentary instrument, are competent and admissible for that purpose. In the case at bar, the conversation objected to was between the deceased and the defendant, Isaac J. Hanson himself, after the deed had been executed by the former and by her delivered to Isaac, and, therefore, said conversation constituted the subject of competent evidence which was admissible upon the theory that the conversation, in so far as Isaac's part therein was concerned, included an admission against his own interest —"admission," in the juridical sense of that term. In fact, the proof of the conversation involved, necessarily, proof of extrajudicial statements concerning the transaction in dispute, which, except where they are mere self-serving declarations of the declarant, are always admissible under the familiar rule of evidence that they are against the interest of the declarant.

As stated, no other points are made. We have in our examination of the record found no legal reason for disturbing the decision below.

Judgment affirmed.

Nicol, P. J., *pro tem.,* and Burnett, J., concurred.