[Civ. No. 27014.   Second Dist., Div. Two.   June 10, 1963.]

Estate of BERNARDO VENTURA, Deceased. PIETRO CANALE, Plaintiff and Appellant, v. MARIO MARION et al., Defendants and Respondents.

F. M. Andreani for Plaintiff and Appellant.

Stanley Mosk, Attorney General, Carl Boronkay and Edmond B. Mamer, Deputy Attorneys General, for Defendants and Respondents.

FOX, P. J.—Pietro Canale, half-brother of Bernardo Ventura,[1] deceased, has appealed from a judgment admitting to probate a will of decedent dated April 26, 1961, and denying probate of a prior purported will, and from an order granting a motion for a directed verdict made by the Attorney General.

On March 23, 1962, one Mario Marion filed a petition for probate of will in the Superior Court for Los Angeles County, alleging that the death of decedent occurred three days previous and that the will offered was his last will. Six days later, decedent's half-brother, Pietro, filed a contest of will, alleging that the will offered for probate by Marion was executed under Marion's undue influence and that decedent was not of sound and disposing mind when the will was executed. Four days after that, Pietro filed a petition for probate of will, alleging that a will dated previous to that submitted by Marion was instead decedent's last will. He submitted that will previously dated. Seventeen days later, the Attorney General of the State of California filed an answer to the will contest. Marion also subsequently filed an answer to Pietro's contest.

The questions presented by these filings came to trial by jury on July 25, 1962, under the title, "*In the Matter of the Estate of Bernardo Ventura, deceased.*" Pietro moved

---

[1] Decedent's true name was Luciano Canale.

that the Attorney General's answer to the will contest be stricken. The motion was denied. Pietro waived the issue of testamentary capacity and stipulated that the only issue to be tried was whether or not the decedent was acting under the undue influence of Marion at the time of making the will first offered for probate and bearing the later date of the two wills in question.

Pietro presented his case, and at its conclusion the Attorney General moved for a nonsuit on the ground that no substantial evidence had been introduced that the later will was executed under the undue influence of Marion. After hearing brief argument, the trial judge suggested that the Attorney General make a motion for a directed verdict. The Attorney General so moved and the motion was granted.

The court directed the jury to return a verdict that the later-dated will was not obtained through the undue influence of Marion. The jury returned a special verdict to that effect. Marion's petition for probate was granted and Pietro's petition for probate was denied.

### DIRECTED VERDICT

Pietro filed notice of appeal from, *inter alia,* the trial court's order directing the verdict of the jury. Such an order is a nonappealable one. The purported appeal therefrom must therefore be dismissed. (*Dunlap* v. *Pacific Electric Ry. Co.,* 12 Cal.App.2d 473 [55 P.2d 894]; Code Civ. Proc., § 963; Prob. Code, § 1240.)     The propriety of granting the motion is, however, reviewable on the appeal from the judgment.

### ATTORNEY GENERAL

In his brief, Pietro argues that the actions of the Attorney General in filing an answer and participating in the trial were, at best, premature and that Pietro's motion to strike the answer of the Attorney General should have been granted. He urges that the state, acting through the Attorney General, should not be allowed to ". . . throw the weight and influence of its State paid attorney on the side of a stranger to the blood [Marion] as proponent of a Will, and against the heirs at law [Pietro] . . ." Pietro characterizes the Attorney General's participation as ". . . the use of the power and the resources of the State to prevent the heirs at law from establishing the undue influence of the proponent in procuring the Will."

The Attorney General entered the proceedings because the will first offered but bearing the later date bequeaths the resi-

due of the estate to "a deserving home for orphans, such home to be selected by my executor." In his answer, the Attorney General alleges that he has a right and duty to participate in the proceeding to protect "the gift to charity" and is acting for the state as *parens patriae*.

The right to answer a will contest is given to all persons interested in the will by section 370 of the Probate Code.

█ It is well established that it is not only the right but the duty of the Attorney General to participate in court proceedings to protect charitable gifts. (*Estate of Quinn*, 156 Cal.App.2d 684 [320 P.2d 219]; *In re Los Angeles County Pioneer Society*, 40 Cal.2d 852 [257 P.2d 1].) █ Appellant urges that section 12591 of the Government Code should be interpreted as forbidding the Attorney General from acting as he has in the instant case. The section declares, in part, that "[t]he Attorney General may institute appropriate proceedings to secure compliance with [the Uniform Supervision of Trustees for Charitable Purposes Act as enacted in California] . . . and to invoke the jurisdiction of the court." █ The scheme of the uniform act of which section 12591 is a part is to provide for the scrutiny by the Attorney General of fiduciaries dealing with charity funds. █ The section cited by appellant is inapplicable to the situation in the case at bar. And it does not *prohibit* actions of the Attorney General. Rather, the section expressly states that "[t]he powers and duties of the Attorney General provided in this article [the Uniform Act] *are in addition to his existing powers and duties*." (Italics added.) Since the Attorney General's powers with respect to will contests involving charitable trusts were established well prior to the enactment of the uniform act in this state, it cannot be validly argued that the section cited in any way proscribes those powers.

█ Appellant also suggests that, since it is not certain that the provision in the will (regarding an orphans' home) does establish a charitable trust the Attorney General should not, therefore, have been allowed to come into the case until that issue had been decided and unless the provision were held valid. But, where there is any question of the validity of a purported charitable trust in a will, it would seem that there is an *a fortiori* reason for the Attorney General's participation, since it is only he who, representing the public which benefits by a charitable trust, will or can act as advocate in support of the validity of the charitable provision.

We can find no reason to hold the Attorney General's actions improper.

## EVIDENCE OF UNDUE INFLUENCE

■ Since Pietro stipulated that the only issue to be tried in the court below was whether or not the decedent was under the undue influence of Marion at the time of making the will which the trial court admitted to probate, our task in evaluating the evidence adduced is solely to determine whether there is any substantial evidence which would have supported a jury verdict finding undue influence. If we do find such evidence, we must reverse. ■ In determining whether the evidence is legally sufficient to withstand a motion for directed verdict, every presumption is in favor of the losing party and he is entitled to have drawn from the testimony every proper inference favorable to his case. (*Barthelmess* v. *Cavalier*, 2 Cal. App.2d 477 [38 P.2d 484]; see, also, *Estate of Arnold*, 147 Cal. 583 [82 P. 252].)

■ "Undue influence consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating on it; some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment." (*Estate of Ricks*, 160 Cal. 467, 480 [117 P. 539].)

■ "It is not undue unless the pressure has reached a point where the mind of the person subjected to it gives way before it so that the action of such person taken in response to the pressure does not in fact represent his conviction or desire, brought about perhaps by argument and entreaty, but represents in truth but the conviction or desire of another." (*Estate of Anderson*, 185 Cal. 700, 707 [198 P. 407]; see, also, *Estate of Welch*, 43 Cal.2d 173, 175 [272 P.2d 512]:

■ " '[I]t must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator. (*Estate of Keegan*, 139 Cal. 123, 127 [72 P. 828].) . . .' " [Quoting from *Estate of Arnold*, 16 Cal.2d 573, 577 [107 P.2d 25].])

■ "It is frequently said that a *strong showing* is necessary [to prove undue influence], or that the proof must be by *clear and convincing evidence*. (See *Estate of Anderson*, *supra*, . . . )" (4 Witkin, Summary of Cal. Law, Wills, § 77.)

■ In addition, "the fact that the person charged with undue influence did not actually benefit by the will tends to

refute the charge [of undue influence]." (4 Witkin, Summary of Cal. Law, Wills, § 77.) ██ It has also been held that the benefit must be a *personal* gain to the person charged. (*Estate of Muller,* 14 Cal.App.2d 129 [57 P.2d 994].) In *Muller,* although the child of the person charged benefited, the court reversed a judgment denying probate since, *inter alia,* the person charged gained nothing *personally.*

██ In the instant case, it cannot be said that Marion, the person whom Pietro charges with exerting undue influence over decedent, has personally benefited from the will. He is left no bequest by the will. Although decedent did name Marion executor and waived bond, this, without more, cannot be considered a gift. Marion's discretion in choosing a particular orphans' home to receive funds from the residue likewise does not result in any personal gain to Marion. Nor does there seem to be any benefit accruing from the will which can be said to flow indirectly to Marion, as there was in *Estate of Trefren,* 86 Cal.App.2d 139 [194 P.2d 574], where a wife was active in obtaining the preparation and execution of a will making her husband the sole beneficiary. There the activity of the wife was imputed to the husband, and undue influence was held to have been shown. ██ But, even though it is not necessary to show that the person charged with undue influence actually profited by the will (*Estate of Bixler,* 194 Cal. 585 [229 P. 704]) and even though lack of profit does not negate undue influence but only tends to refute the charge (*Estate of Muller, supra*), nevertheless, absent this factor, a stronger combination of other factors is required to make a prima facie case of undue influence. ██ Yet, if these other factors show that ". . . the will represents the desire and purpose of [another] . . . instead of the desire and purpose of the [testator] . . . and was procured by [the former] . . . by dominating and controlling [the latter's]. . . mind and will, it is wholly immaterial whether or not he profited or will profit therefrom." (*Estate of Bixler, supra,* at p. 595.)

"The proof of undue influence by circumstantial evidence [which is the type of evidence of necessity offered in the instant case] usually requires a showing of a number of factors which, in combination, justify the inference [of undue influence], but which taken individually and alone are not sufficient." (4 Witkin, Summary of Cal. Law, Wills, § 78.) ██ Factors, other than personal gain, as given by the case law, are: "(1) The provisions of the will were unnatural . . . . (2) the dispositions of the will were at variance with the intentions

of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; . . .'' (*Estate of Yale*, 214 Cal. 115, 122 [4 P.2d 153]; *Estate of Bould*, 135 Cal.App.2d 260, 274 [287 P.2d 8, 289 P.2d 15].) A further factor that is considered material is that the person charged with undue influence was in fact active in procuring the execution of the instrument in question. (*Estate of Graves*, 202 Cal. 258 [259 P. 935].) We shall now examine the fact picture shown by the evidence to see which, if any, of these factors have been shown to exist in the instant case.

### UNNATURAL PROVISIONS

■ ''Unnatural provisions'' are defined as those which prefer strangers in blood to the natural objects of the testator's bounty. (See, e.g., *Estate of Shay*, 196 Cal. 355 [237 P. 1079].) But, ''the fact that the testator fails to provide for *collateral heirs, such as nephews, or even brothers and sisters,* does not support the contention that the will is unnatural. (*Estate of Jacobs*, 24 Cal.App.2d 649 [76 P.2d 128]; *Estate of Nolan*, 25 Cal.App.2d 738 [78 P.2d 456].)'' (4 Witkin, Summary of Cal. Law, Wills, § 78.) (Italics added in part.) ■ The fact that an orphans' home is favored over decedent's half-brother Pietro, therefore, adds little or nothing to his attempted proof of undue influence.

### VARIANCE FROM DECEDENT'S EXPRESSED INTENTIONS

In the case at bar, the will of decedent bearing the prior date benefited Pietro and his family. There was, in addition, another former will, not offered for probate, which similarly conferred benefit. In addition, the evidence shows that decedent had spoken fairly recently before his death about his will, saying that it would benefit Pietro's family. ■ But, even '' [c]onceding that the provisions of [the] . . . will were unnatural, *that its dispositions were at variance with [the decedent's] . . . preexisting testamentary intentions,* that [the person charged with undue influence] . . . had an opportunity to subvert [decedent's] . . . will and that [his] . . . condition was such as to permit of a subversion of . . . freedom of will, and that [the person charged with undue influence] . . . benefited by the provisions of the will, there still is no

proof of undue influence. Evidence of activity . . . in procuring execution of the will is entirely lacking.'' (*Estate of Lingenfelter*, 38 Cal.2d 571, 585-586 [241 P.2d 990].) (Italics added.) Without more, variance of the will from decedent's expressed intentions is not enough to defeat successful urging of a motion for a directed verdict.

### RELATIONS BETWEEN BENEFICIARIES AND DECEDENT

Since it has been shown that Marion, the person charged with undue influence, is not a beneficiary, the factor of relations existing between the chief beneficiaries and the decedent, and whether they afforded to the former an opportunity to control the testamentary act, becomes irrelevant.

Even if Marion were a beneficiary, mere opportunity to exercise influence, even when coupled with interest or motive, does not give rise to any inference that it was in fact exercised. (*Estate of Kilborn*, 162 Cal. 4 [120 P. 762].)

At most, the evidence shows that Marion was a friend of decedent, that decedent and Marion apparently argued on one occasion, that at the time of making the will benefiting orphans, decedent was in the hospital ill[2] and he had been visited there by Marion and the latter's daughter, and that the will was drafted by an attorney who was summoned by Marion at decedent's request and who had previously prepared income tax returns for Marion. Although it might be argued that Marion was in such a position that his suggestions would carry great weight with decedent, this is not enough to show that there was undue influence. Even if it be conceded that Marion enjoyed a confidential relationship with decedent, no presumption of undue influence arises from this alone, since Marion is not also ''one who unduly profits by the will as a beneficiary thereunder'' nor has he ''actually participated in procuring the execution of the will. . . .''[3] (*Estate of Lombardi*, 128 Cal.App.2d 606, 612 [276 P.2d 67]; *Estate of Bould*, 135 Cal.App.2d 260, 275 [287 P.2d 8, 289 P.2d 15].) (Italics omitted.)

### MENTAL AND PHYSICAL CONDITION OF DECEDENT

Without a showing of a weakened physical or mental state, it is difficult to draw the inference that there was activity and pressure which actually succeeded in overpowering the will of the testator. (*Estate of Anderson*, 185 Cal. 700 [198

---

[2]The will was executed some 11 months prior to his death.
[3]See *infra*, p. 60 et seq.

P. 407].)   Otherwise, any "influence" charged is characterized as "advice or entreaty which persuaded" decedent. (4
Witkin, Summary of Cal. Law, Wills, § 80.) While decedent
was hospitalized at the time he made the will, there is no evidence to indicate that his mind was impaired. In fact, evidence
cited by appellant to show decedent's state of mind and his intentions also serves to show the lucidity and clear thinking
of decedent.

<h3 style="text-align:center">PROCUREMENT OF THE INSTRUMENT</h3>

▮▮▮   The only direct evidence regarding the procurement
of the will was in testimony of the attorney who drafted the
instrument.  He testified that on April 24, 1961, Marion telephoned him and told him that decedent wished to make certain
business transactions while hospitalized; the witness further
stated that Marion had said, *inter alia*, that decedent ". . .
wanted to have a will drawn. . . ."   ▮▮▮   Even though
actual participation in procuring the will is a material factor
(and, if combined with undue profit and a confidential relationship with the testator, leads to a shifting of the burden of
proof to the person charged, if he is a beneficiary, to show absence of coercion or fraud (*Estate of Bould,* 135 Cal.App.2d
260, 275 [287 P.2d 8, 289 P.2d 15])), nevertheless "[t]here
must be activity on the part of the beneficiary in the matter
of the *preparation* of the will." (*Estate of Bould, supra,*
quoting *Estate of Lombardi,* 128 Cal.App.2d 606, 612 [276
P.2d 67], quoting *Estate of Burns,* 26 Cal.App.2d 741 [80
P.2d 77].)   (Italics in part omitted.)   "Some incidental
activity in the execution, rather than the preparation of the
will, is not enough to swing the burden. . . . It has been
held that the mere fact of the beneficiary *procuring an attorney* to prepare the will is not sufficient 'activity' [i.e., 'activity' in the preparation of the will] to bring the presumption [of coercion or fraud] into play (*Estate of Llewellyn,* 83
Cal.App.2d 534, 565 [189 P.2d 822, 191 P.2d 419]; . . .)."
(*Estate of Bould, supra.*)   (Italics added.)   ▮▮▮   It similarly follows that evidence of the procuring of an attorney
(vis-à-vis procuring of the will) is a very weak element in
the case of one attempting affirmatively to prove undue influence.  At most, the evidence on this point in the instant
case shows that it was decedent, not Marion, who wanted a will
to be drawn, and that Marion obtained an attorney for decedent at decedent's request.  There is no evidence whatever of
any participation of Marion in the drafting of the instrument, and there is no suggestion in the record that execution

of the will was fulfillment of any desire on Marion's part.

On balance, it cannot be said that there is substantial evidence to show that the will admitted to probate by the court below was a result of a force which was such as to have "destroyed the testator's free agency, and substituted for his own another person's will" (*Estate of Motz,* 136 Cal. 558, 563 [69 P. 294]), of "*coercion* destroying free agency on the part of the testator" (*Estate of Keegan,* 138 Cal. 123, 127 [72 P. 828]) (italics added), or of " 'a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.' " (*Estate of Gleason,* 164 Cal. 756, 765 [130 P. 872].) Taking all evidence and inferences in favor of the contestant Pietro, we must still affirm the court below.

## EXCLUSION OF EVIDENCE

Appellant argues that it was prejudicial error for the trial court to have refused to allow the introduction of decedent's agreement with an institution called St. Luke's Manor which would have shown, *inter alia,* that decedent was to lodge at the institution and that the person to notify in the event of an emergency was Marion. Inferences which he would wish to be drawn from the evidence are: (1) Decedent abandoned his home of 38 years shortly before his death; (2) St. Luke's Manor was across the street from Marion's residence. The ruling of the court appears to be correct.

"The materiality of evidence is a question of law and a wide discretion is left to the trial judge in determining its admissibility. [Citations.] His ruling thereon, in the absence of an abuse of discretion, will not be disturbed upon appeal. (*Estate of Ades,* 81 Cal.App.2d 334, 342 [184 P.2d 1].) " (*Decter* v. *Stevenson Properties, Inc.,* 39 Cal.2d 407, 420 [247 P.2d 11].) We cannot see how the rejected evidence in any way bears on the sole issue in the case, *viz.,* whether the will was executed under the undue influence of Marion. The fact that Marion was to be notified in case of an emergency shows, at most, a friendly relationship between decedent and Marion; as we have shown, this is not probative of undue influence. In addition, neither the fact that decedent moved away from his home nor the location of the Manor with respect to Marion's residence is evidence of any " '. . . pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.' " (*Estate of Gleason, supra,* at p. 765.)

In any event, the exclusion of this testimony could not

be considered prejudicial, since it is of such slight significance and could not have cured the deficiency in Pietro's case.

The attempted appeal from the order directing the verdict is dismissed. The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied July 3, 1963, and appellant's petition for a hearing by the Supreme Court was denied August 7, 1963.