Filed 4/21/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Estate of SONIA SOBOL. | B250306 |
| | (Los Angeles County Super. Ct. No. BP138349) |
| JAY ROSE et al., | |
| Objectors and Appellants, | |
| v. | |
| TERRY SHAYLIN et al., as Executors, etc., | |
| Respondents. | |

APPEAL from orders of the Superior Court of Los Angeles County, Reva G. Goetz, Judge.  Affirmed.

Steven R. Friedman and Michael E. Friedman for Objectors and Appellants.

Reed Smith LLP, Margaret M. Grignon, for Respondents.

# I.  INTRODUCTION

The objectors, Jay Rose and Fred Maidenberg, appeal from two May 2013 probate court orders.  The objectors appeal from an order appointing co-executors, Terry D. Shaylin, Dolores Diehl, and Dr. Maria Gracita DaCosta-Iyer.  They were appointed to act as executors of the estate of the decedent, Sonia, also known as Sonya, Sobol.  In addition, the objectors appeal from an order denying Mr. Rose's competing petition with prejudice.  Mr. Rose's competing petition sought to have him named as executor.  The probate court sustained the co-executors' demurrers without leave to amend because the objectors lacked standing.  The objectors argue the probate court has inherent and statutory authority to give them standing pursuant to Probate Code[1] section 48.  The objectors contend:  they have standing to challenge the codicil, which replaced Mr. Rose as executor, with the co-executors; the codicil was procured by Ms. Shaylin through elder abuse of Ms. Sobol; and Ms. Sobol was an elderly and enfeebled woman who lacked testamentary capacity when the codicil was executed.  We conclude the objectors lack standing to contest the codicil.  We affirm the order denying Mr. Rose's competing petition in which he sought to be named as executor.  Thus, we affirm the orders under review.

# II.  BACKGROUND

## A.  Will And Trust

Ms. Sobol's pour-over will is dated December 23, 2010.  The will provides that all of Ms. Sobol's property owned at the time of her death will be held by the Sonya Sobol Trust dated December 23, 2010.  Ms. Sobol's property was to be distributed in accordance with the provisions of the Sonya Sobol Trust.  The will disinherited

---

[1] Future statutory references are to the Probate Code unless otherwise indicated.

2

Ms. Sobol's nephew, Mr. Maidenberg, his mother, and his siblings. The will designated Mr. Rose as executor. Avi S. Peretz was designated successor executor.

The Sonya Sobol Trust is a revocable living trust, which became irrevocable upon Ms. Sobol's death. Ms. Sobol was both the primary trustee and beneficiary. Mr. Rose was designated successor trustee. Ms. Peretz was designated alternative successor trustee. The declaration of trust allowed Ms. Sobol the power to amend the trust during her lifetime.

The trust was to distribute its assets upon Ms. Sobol's death. Ms. Sobol gave $250,000 as a gift to Rema Gralnick. In addition, Ms. Sobol gave her apartment located in Israel to Jacob Sobol. The remainder of the trust assets was to be given to the trustee for the establishment of a charitable foundation in the name of Ms. Sobol's deceased son, Dr. Efim Sobol. The Efim Sobol Foundation would support medical research and education and the building and development of a hospital in Ashdod, Israel. Mr. Maidenberg, his mother, and his siblings received nothing under the trust.

B. Will And Trust Amendments

On August 30, 2012, Ms. Sobol signed an amendment to the trust declaration. The amendment changed the successor trustee from Mr. Rose to three successor co-trustees— Ms. Diehl, Ms. Shaylin and Dr. DaCosta-Iyer. The amendment made no other changes to the trust declaration.

On September 27, 2012, Ms. Sobol signed a codicil to her will. The codicil revoked the designation of Mr. Rose and Ms. Peretz as executors. The codicil appointed Ms. Diehl, Ms. Shaylin, and Dr. DaCosta-Iyer as co-executors of the will. No other changes were made to the will.

Ms. Sobol died on December 15, 2012, at the age of 89. The estimated value of her estate was $22 million. Ms. Sobol was a widow with no living children. Her only child, Dr. Sobol, died in February 28, 2007 leaving his trust estate to his parents. Ms. Sobol's husband died on January 6, 2008.

3

C.  Petition For Probate Of Will And Letters Testamentary

On December 21, 2012, the co-executors filed a petition in probate court.  They sought to admit Ms. Sobol's will and codicil to probate and their appointment as co-executors of her estate.  The petition was served on the objectors and the Attorney General.  Ms. Sobol's trust is in material part a charitable trust.  The Attorney General has the primary responsibility for supervising charitable trusts.  (Gov. Code, § 12598, subd. (a); *Hagman v. Meher Mount Corporation* (2013) 215 Cal.App.4th 82, 89.)  No change to the trust provisions can be effectuated unless the Attorney General is a party to the litigation.  (Gov. Code, § 12591; see *Estate of Ventura* (1963) 217 Cal.App.2d 50, 57.)  When a charitable portion of a revocable trust becomes irrevocable, as occurred here, upon Ms. Sobol's death, the Attorney General must be notified.  (§ 16061.7, subds. (a)(1), (b)(3); Ross & Cohen, Cal. Practice Guide:  Probate (The Rutter Group 2013) ¶ 2:115.7, p 2-76.4 (rev. #1, 2013).)

The three co-executors submitted declarations in support of the petition.  In addition, two declarations were submitted by the two witnesses to the execution of the codicil.  Ms. Shaylin filed a declaration.  Between May 2011 and August 2012, Ms. Shaylin represented Ms. Sobol's affiliated entity, Summer View Sherman Oaks, LLC in civil litigation and a subsequent Chapter 11 bankruptcy reorganization.  In addition, Ms. Shaylin was general bankruptcy counsel for Ms. Sobol commencing April 19, 2012, the date of her Chapter 11 filing.  Ms. Shaylin continued in that capacity until Ms. Sobol's death.  On January 10, 2013, the United States Bankruptcy Court granted Ms. Shaylin's law firm's application to withdraw as general bankruptcy counsel for Ms. Sobol.

In August, 2012, Ms. Sobol and Ms. Shaylin had a conversation concerning changes in the trust.  According to Ms. Shaylin, the following occurred, "In August 2012, Ms. Sobol asked me whether I would agree to be a co-trustee of her living trust together with two other co-trustees, [Dr.] DaCosta-Iyer, her friend and colleague of her deceased son and [Ms.] Diehl, another long term friend and business associate."  In compliance

4

with Ms. Sobol's instructions, Ms. Shaylin amended the trust by removing Mr. Rose and Ms. Peretz as successor trustees. The new successor trustees were Ms. Shaylin, Dr. DaCosta-Iyer and Ms. Diehl. Ms. Sobol signed and notarized the amendment to the trust on August 30, 2012.

In September, 2012, Ms. Sobol spoke with Ms. Shaylin about changing the will's executors. Ms. Shaylin's declaration states: "Ms. Sobol told me that her intention was that the three successor co-trustees of the . . . [t]rust . . . also serve as co-executors of her will. Ms. Sobol told me that when she executed the amendment to the trust changing successor co-trustees to [Ms.] Diehl, [myself] and[ Dr.] DaCosta-Iyer she intended to change the co-executors of her will as well, but did not realize at that time she needed to amend her will in writing as well."

Ms. Shaylin then prepared a codicil to the will, which Ms. Sobol signed on September 27, 2012. The codicil removed Mr. Rose and Ms Peretz and appointed Ms. Shaylin, Ms. Diehl and Dr. DaCosta-Iyer as the co-executors. Ms. Sobol executed the codicil before her and two other witnesses. The two other witnesses were Thomas Gallagher, a notary public, and Norma Cobillo, Ms. Sobol's caregiver. Both Mr. Gallagher and Ms. Cobillo signed declarations stating they saw Ms. Sobol sign the codicil. Before Ms. Sobol signed the codicil, Mr. Gallagher read the amendment to the will to her. Ms. Sobol told Mr. Gallagher she wanted to change her will to remove the previous executors. According to Mr. Gallagher, Ms. Sobol stated her intention to appoint Ms. Shaylin, Ms. Diehl, and Dr. DaCosta-Iyer as executors of her will. Ms. Shaylin observed Ms. Sobol correct a typographical error in Ms. Diehl's name. Ms. Sobol made the correction in her own handwriting. Mr. Gallagher notarized the codicil dated September 27, 2012. Mr. Gallagher also notarized Ms. Sobol's correction to Ms. Diehl's name in the trust amendment dated August 30, 2012.

Both Ms. Diehl and Dr. DaCosta-Iyer filed declarations concerning their relationship with Ms. Sobol. Ms. Diehl had known Ms. Sobol since 2003 and they met on a regular basis. Ms. Diehl was a resident manager of Ms. Sobol's 32-unit apartment building. Dr. DaCosta-Iyer had been close friends with Ms. Sobol's late son, Dr. Sobol

5

since 1986. Dr. Sobol and Dr. DaCosta-Iyer worked as pathologists at the Veterans Administration Hospital in Long Beach. Ms. Sobol asked both Ms. Diehl and Dr. DaCosta-Iyer to act as co-trustees and co-executors of the trust and the will respectively. Ms. Diehl and Dr. DaCosta-Iyer both agreed to do so.

### D. The Objector's Opposition To The Petition And Mr. Rose's Petition

On March 5, 2013, Mr. Rose filed an opposition to the co-executors' petition. Mr. Rose contested the codicil replacing him with the co-executors. He objected to the codicil on four grounds: Ms. Sobol lacked testamentary capacity at the time she executed the codicil; the codicil was made as a direct result of undue influence exercised by Ms. Shaylin; Ms. Shaylin benefited from the codicil she drafted; and the codicil was improperly executed. Mr. Rose submitted his own declaration. In addition, Mr. Rose submitted declarations by Steven R. Friedman, an attorney, and Mr. Maidenberg.

Mr. Friedman stated on June 24, 2012, he met with Ms. Sobol. Mr. Maidenberg was also present at the meeting which was held in Ms. Sobol's Los Angeles apartment. Mr. Maidenberg asked Mr. Friedman to meet Ms. Sobol at her request. During the meeting, Mr. Friedman observed Ms. Sobol did not know: the extent of her assets; the basis for the lawsuit which resulted in a $10 million judgment against her; whether she had insurance related to the claim; and the day of the week. Mr. Friedman observed Ms. Sobol was agreeable to any suggestion made to her and often agreed with contradictory statements. According to Mr. Friedman, Ms. Sobol appeared "frail, unclear in thought and was notably lacking in specific memories and working to mask the effects" of aging and diminishing capacity. Ms. Sobol suggested Mr. Friedman speak with Ms. Shaylin. Ms. Shaylin was familiar with Ms. Sobol's legal problems, buildings and financial matters. Ms. Sobol also urged Mr. Friedman to speak with Mr. Maidenberg, who she called "Freddy." After speaking with Mr. Friedman for an hour, Ms. Sobol was eager to execute a written retainer agreement with him. But Mr. Friedman declined to have Ms. Sobol execute the retainer agreement because he

6

believed she did not understand the nature of the document. Ms. Sobol indicated Mr. Maidenberg would give directions to her attorneys on her behalf.

After the meeting, Mr. Friedman spoke with Ms. Shaylin. Mr. Friedman recommended the probate court appoint a conservator for Ms. Sobol because of her lack of mental capacity. After Ms. Sobol died, Mr. Friedman was surprised to learn that she had executed the trust amendment and codicil only a few weeks after his meeting with her. Mr. Friedman stated Ms. Sobol "evidenced such seriously diminished capacity amounting to incapacity to contract" when he met her on June 24, 2012. Mr. Friedman believed Ms. Sobol had diminished capacity and was unable to understand, recall or manage her own affairs.

Mr. Maidenberg stated he was Ms. Sobol's nephew. He had been a certified public accountant since 1979 and prepared Ms. Sobol's income tax returns for years. Mr. Maidenberg also prepared Dr. Sobol's income tax returns. Mr. Maidenberg gave them financial advice concerning their apartment ownership, rental business, dealing with attorneys and interactions with the City of West Hollywood. After Dr. Sobol's death, Ms. Sobol would call or visit Mr. Maidenberg to discuss financial issues. Mr. Maidenberg described the meeting with Ms. Shaylin as follows: "It was in connection with the tending to [Ms. Sobol's] financial affairs that I first met Ms. Shaylin. I met with Ms. Shaylin who was retained by [Ms. Sobol] as her bankruptcy attorney. Ms. Shaylin came to my office, met with me, and obtained property management reports that she requested in connection [with] the bankruptcy proceedings." Mr. Maidenberg helped Ms. Sobol sell some of her real estate holdings so she could satisfy a $7 million estate tax that was incurred after Dr. Sobol's death. Mr. Maidenberg also computed the taxes and completed tax forms for Ms. Sobol. He did not charge Ms. Sobol for any of his services. In April 2012, Ms. Sobol presented Mr. Maidenberg with a gift of a $25,000 check. Mr. Maidenberg believed Ms. Sobol wanted to thank him for his free services over the years.

In June 2012, Mr. Maidenberg met with Ms. Sobol and Mr. Friedman at her apartment. They met to discuss the possible retention of Mr. Friedman for an appeal of a

7

$10 million judgment. The judgment was obtained against Ms. Sobol by a contractor who fell off a roof of one of her properties. Mr. Maidenberg observed Ms. Sobol was unresponsive to inquiries made by Mr. Friedman about the lawsuit and judgment. In addition, Ms. Sobol was unaware of the nature and extent of her assets. Mr. Maidenberg believed Ms. Sobol did not have the capacity to enter into a retainer agreement or participate in the appeal. Mr. Maidenberg later spoke to Ms. Shaylin. He told Ms. Shaylin that Ms. Sobol could not participate in or direct the appeal. Shortly thereafter, Mr. Maidenberg received a letter from Ms. Shaylin stating she could not discuss the litigation with him. Subsequently, Mr. Maidenberg received another letter from Ms. Shaylin. Ms. Shaylin's letter stated another accountant had been retained to perform Ms. Sobol's tax work.

In August or September 2012, Mr. Maidenberg had his last conversation with Ms. Sobol. During the conversation, Ms. Sobol accused Mr. Maidenberg of taking away her property and putting her in an institution. Mr. Maidenberg was incredulous about Ms. Sobol's accusations considering his close relationship with her. He also was incredulous about being fired as Ms. Sobol's accountant. Mr. Maidenberg had performed accounting services free of charge for Ms. Sobol for years. He did not understand why Ms. Sobol would choose someone else who would charge her for tax and financial work. Mr. Maidenberg believed Ms. Shaylin poisoned his relationship with Ms. Sobol, his aunt.

Mr. Maidenberg acknowledged: "I have no direct or [in]direct interest in the outcome of this matter. I am not a beneficiary of any of Aunt Sonia's testamentary documents. I do not stand to inherit one iota of any asset in any outcome of this matter. In fact, Aunt Sonia previously asked me if I wanted to be included as a beneficiary of her estate. I declined that lovely and generous offer as I felt that I had sufficient holdings and not require her financial assistance. In addition, I am not named as an Executor, Trustee or other personal representative in any of Aunt Sonia's testamentary documents."

Mr. Rose is an attorney. Ms. Sobol retained Mr. Rose in 2008 to defend against an attack on Dr. Sobol's trust. At that time, Ms. Sobol was sharp, focused and in control of her faculties. In 2010, Ms. Sobol discussed with Mr. Rose her testamentary plan, which

8

resulted in the drafting and execution of the trust and pour-over will. Ms. Sobol asked Mr. Rose to serve as successor trustee. Ms. Sobol named Ms. Peretz, as a "back-up" successor trustee. Ms. Sobol and Ms. Peretz were friends. In addition, Ms. Sobol gave Mr. Rose power of attorney to handle her healthcare decisions. Through his handling of Ms. Sobol's business and legal matters, Mr. Rose met and worked with Ms. Shaylin. Prior to Ms. Sobol's execution of the codicil, she became gravely ill and was admitted to the intensive care unit at Cedars-Sinai Hospital. Ms. Sobol suffered kidney failure and Mr. Rose consented to dialysis treatment for her.

Mr. Rose believed although Ms. Sobol was incapacitated, her attending physician, Dr. Michael T. Duffy, initially refused to execute an incapacity declaration. Mr. Rose asserted Dr. Duffy did not want to be "'caught up'" in any litigation. Later, Dr. Duffy signed an incapacity declaration on July 25, 2012.

The attached declaration from Dr. Duffy indicated he had been Ms. Sobol's primary care physician for the past 15 years. Dr. Duffy stated as of July 25, 2012, Ms. Sobol did not have sufficient ability to communicate decisions about her property and finances while undergoing medical treatments. Dr. Duffy added: "Such condition is temporary in nature and does not affect Sonia Sobol's cognitive abilities, memory, and ability to communicate in general, once the treatment is completed. [¶] Once the treatment is completed, in or about fourteen days from the day of this Declaration, I will evaluate Ms. Sobol's ability to communicate her decisions about her property, and finances and make determination whether the durable power of attorney for financial purposes in connection with Ms. Sobol should remain in any effect."

Mr. Rose stated Dr. Duffy inexplicably signed a second declaration five days later on August 1, 2012. The attached second declaration from Dr. Duffy states, "I declare that, as of the date of this Declaration, Sonia Sobol has sufficient understanding and ability to make and communicate decisions about her property, finances and business affairs." After a month in the hospital, Ms. Sobol was brought to a convalescent facility. Mr. Rose visited Ms. Sobol on numerous occasions and tried to engage in conversations with her. He observed Ms. Sobol's response to his business and personal inquiries were

9

unintelligible or non-responsive. Mr. Rose left for vacation after his last visit with Ms. Sobol. When he returned, he learned Ms. Sobol had executed the codicil replacing him as executor. Ms. Sobol also replaced Mr. Rose as her healthcare agent with Ms. Shaylin. Mr. Rose was shocked Ms. Sobol had executed the codicil and trust amendment. Mr. Rose's declaration states: "The Decedent that I previously knew was a competent, thorough and business-like woman who could respond intelligibly to my inquires and make informed decisions. However, the person that the Decedent had become after [her] near-brush with death was someone who could not engage in any minimal form of reasonable conversational exchange, let alone understand the nature and consequences of any financial or testamentary documentation."

### E. Demurrers To The Objection And Petition

On March 11, 2013, the co-executors demurred to Mr. Rose's opposition to their petition. On March 19, 2013, the co-executors demurred to Mr. Rose's competing petition. Both demurrers were served on the objectors and the Attorney General. The co-executors argued Mr. Rose had no standing to contest the codicil because he did not have an interest in the estate. On April 2, 2013, Mr. Rose filed an opposition to the co-executors' demurrer to his objection. On April 9, 2013, Mr. Rose filed an opposition to co-executors' demurrer of his competing petition, which Mr. Maidenberg joined as a creditor of the estate. They argued Ms. Sobol was incompetent to act and the codicil was obtained by elder abuse and fraud. In support of the demurrer oppositions, the objectors resubmitted the March 2013 declarations from Mr. Friedman, Mr. Rose and Mr. Maidenberg. In addition, the objectors submitted additional declarations from Mr. Maidenberg, Rabbi Hertzel Illuian and Marya Mazisyuk in support of their demurrer oppositions.

Rabbi Illulian is a hospital and prison chaplain. He was Ms. Sobol's friend, rabbi and personal advisor for many years. He visited Ms. Sobol once a week and she often visited him and his family at his home. In 2012, Ms. Sobol was very ill. Ms. Sobol

10

requested Rabbi Illulian visit her in the hospital and convalescent facility. But Rabbi Illulian's visits and phone calls to Ms. Sobol were thwarted by Ms. Shaylin. Rabbi Illulian stated a woman working for Ms. Shaylin refused to let him visit Ms. Sobol. Rabbi Illulian stated during the few minutes he was able to speak with Ms. Sobol alone, she told him, "'[Ms. Shaylin] is trying to kill me.'"

Ms. Mazisyuk is 84 years old and was Ms. Sobol's close friend for over 23 years. Ms. Mazisyuk lives in a unit of an apartment building owned by Ms. Sobol. Ms. Sobol lived in the penthouse unit. The two women visited each other frequently in their units speaking to each other in their native Russian language. Ms. Mazisyuk observed Ms. Shaylin visit Ms. Sobol once a week. But the visits gradually increased to three or four times a week. Ms. Mazisyuk stated: "In May, 2012, Sonia told me that she believed Terry was trying to take control of Sonia's buildings and finances. Sonia said to me, 'Terry keeps sticking documents in front of me. I don't know what they are. I don't understand them. I have no idea what I'm signing.' I asked Sonia why she signed documents she didn't understand. . . . Sonia said to me that she was in 'too deep' with Terry in the bankruptcy and that she didn't want Terry to walk away from the case. So, as Sonia said to me, 'I have to keep signing whatever she puts in front of me or I'll lose her and have to start all over with someone else.'" Ms. Mazisyuk told Ms. Sobol to call Mr. Maidenberg. Ms. Mazisyuk's declaration states: "[Ms. Sobol] said that she would, and that she wanted to call [Mr. Maidenberg] and ask him to find another lawyer to oversee [Ms. Shaylin]. [¶] [] [Ms. Sobol] told me she was scared of [Ms. Shaylin] and she thought that [Ms. Shaylin] was trying to kill her." After Ms. Sobol was hospitalized, Ms. Shaylin refused to tell Ms. Mazisyuk the name of the hospital. Ms. Mazisyuk learned of Ms. Sobol's death upon receiving a telephone call from Ms. Shaylin about the funeral.

In his second declaration, Mr. Maidenberg stated he was a creditor of Ms. Sobol's estate. He became a creditor of the estate after paying a bill submitted by Ms. Sobol's contractor. The contractor performed extensive work on Ms. Sobol's West Hollywood

property but was not paid in full for the work.  Mr. Maidenberg paid the contractor.  The contractor assigned the debt to Mr. Maidenberg.

## F.  Probate Court Rulings

On April 22, 2013, the probate court held a hearing on the demurrers.  The probate court ruled Mr. Rose did not have standing to contest the codicil.  The probate court sustained both demurrers without leave to amend.  The probate court also ruled Mr. Maidenberg's joinder was improper.  The probate court stated:  "I also know that there was an effort to file a joinder by Mr. Maidenberg, but the way that it was filed isn't appropriate.  Mr. Maidenberg joined in his opposition to the demurrer because he has standing as a creditor, but he didn't do it properly.  The way that he's supposed to do that is he should have filed a notice of joinder to the opposition.  He doesn't just join in it.  [¶] But separate and apart from that, even if he has standing, it doesn't change the fact that Mr. Rose doesn't.  So if he wants to, he can file his own petition, Mr. Maidenberg, but it doesn't change the position with regard to Mr. Rose's position."  In addition, the probate court struck Mr. Rose's April 18, 2013 declaration because it was untimely.  The probate court ruled it was improper for Mr. Rose to now assert standing as a creditor of the estate when he did not raise it in his reply.

The probate court overruled all objections and denied Mr. Rose's competing petition in which he sought to be named as executor.  The probate court approved the co-executors' petition and appointed them with full authority.  Finally, the December 23, 2010 will and the September 27, 2012 codicil was admitted to probate.

On May 21, 2013, the probate court entered the order appointing Ms. Shaylin, Ms. Diehl and Dr. DaCosta-Iyer as co-executors of Ms. Sobol's estate.  On July 26, 2013, Mr. Rose and Mr. Maidenberg filed their notice of appeal.  They appealed the May 28, 2013 order appointing the co-executors and the May 31, 2013 order dismissing Mr. Rose's competing petition and opposition with prejudice.

12

# III. DISCUSSION

## A. Standing

A party has standing to contest a will if that contestant is an "interested person." (§1043, subd. (a) ["An interested person may appear and make a response or objection in writing at or before the hearing"]; *Estate of Lind* (1989) 209 Cal.App.3d 1424, 1430.) Section 48, subdivision (a), which governs whether a party may participate as an "interested person," provides: "Subject to subdivision (b), 'interested person' includes any of the following: [¶] (1) An heir, devisee, child, spouse, creditor, beneficiary, or any other person having a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding. [¶] (2) Any person having priority for appointment as a personal representative. [¶] (3) A fiduciary representing an interested person." Section 48, subdivision (b) states, "The meaning of 'interested person' as it relates to particular persons may vary from time to time and shall be determined according to the particular purposes of, and matter involved in, any proceeding."

The probate court has flexibility in determining whether to permit a party to participate as an interested party. (*Estate of Prindle* (2009) 173 Cal.App.4th 119, 126; *Estate of Davis* (1990) 219 Cal.App.3d 663, 668.) The court in *Davis* explains: "Subdivision (a) of section 48 does not purport to provide an exclusive list of recognizable interests. Rather, it permits the court to designate as an interested person anyone having an interest in an estate which may be affected by a probate proceeding. Subdivision (b) allows the court to determine the sufficiency of that party's interest for the purposes of each proceeding conducted. Thus, a party may qualify as an interested person entitled to participate for purposes of one proceeding but not for another." (*Estate of Davis*, *supra,* 219 Cal.App.3d at p. 668; accord *Estate of Prindle, supra,* 173 Cal.App.4th at p. 126.) Courts have given standing to parties not specifically listed in section 48, subdivision (a). (See *Estate of Prindle, supra,* 173 Cal.App.4th at pp. 126-

13

127 [insurer had standing to petition removal of an administrator as interested person]; *Estate of Maniscalco* (1992) 9 Cal.App.4th 520, 523-525 [prospective bidder on estate property who failed to attend probate confirmation hearing because of erroneous advice by administrator's counsel was an interested person]; *Estate of Davis*, *supra,* 219 Cal.App.3d at pp. 668-669 [administrator's surety qualified as interested person].) We review the probate court's ruling on standing under section 48 for abuse of discretion. (*Estate of Prindle, supra,* 173 Cal.App.4th at p. 126; *Arman v. Bank of Am.* (1999) 74 Cal.App.4th 697, 702; *Estate of Maniscalco, supra,* 9 Cal.App.4th at p. 524.)

The objectors contend they have standing as interested persons under section 48. Section 48, subdivision (a)(1), defines an interested person, which can include an objector, thusly, "An heir, devisee, child, spouse, creditor, beneficiary, or any other person having a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding." Mr. Maidenberg, Ms. Sobol's nephew, is not an heir, devisee or beneficiary under the will and trust. Mr. Maidenberg acknowledged he has "no direct or [in]direct interest in the outcome of this matter" and did "not stand to inherit one iota of any asset in any outcome" in the present litigation. Under section 48, subdivision (a)(1), the status of heir or beneficiary, by itself, is not enough to make a party an "interested person" for standing purposes. (*Lickter v. Lickter* (2010) 189 Cal.App.4th 712, 728; see *Estate of Land* (1913) 166 Cal. 538, 544.) A "beneficiary" must have "a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding" to be an interested person. (*Lickter v. Lickter, supra,* 189 Cal.App.4th at p. 728; see *Estate of Land, supra,* 166 Cal. at p. 544.) Mr. Maidenberg is not an interested person under section 48 because he has no property right in or claim against the trust estate.

Mr. Maidenberg's attempt to join Mr. Rose's opposition as a creditor of Ms. Sobol's estate was rejected by the probate court as improper. Mr. Maidenberg does not challenge that ruling. Further, the issue has not been raised in Mr. Maidenberg's briefs and has thus been forfeited. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4; *Johnston v. Board of Supervisors* (1947) 31

14

Cal.2d 66, 70, disapproved on another point in *Bailey v. Los Angeles* (1956) 46 Cal.2d 132, 139.)

The objectors assert Mr. Rose has standing as the executor named in the will to challenge the codicil because the claimed change would thwart Ms. Sobol's wishes. This contention has no merit. (*Jay v. Superior Court* (1970) 10 Cal.App.3d 754, 757-759 (*Jay*); accord, *Estate of Getty* (1978) 85 Cal.App.3d 757, 760-761.) In *Jay*, the contestant was named co-executor in a will and first codicil. (*Jay v. Superior Court, supra,* 10 Cal.App.3d at p. 756.) A second codicil revoked the contestant's nomination as co-executor. The second codicil appointed the decedent's wife as the co-executor. (*Ibid.*) The contestant challenged the second codicil alleging: the decedent was of unsound mind and under undue influence; the second codicil was not executed by the decedent in the manner and form required by law; probate of the second codicil would be contrary to the decedent's intent; and this was because the contestant could ably conduct the decedent's business to the estate's best interest. (*Id.* at pp. 756-757.)

The Court of Appeal held the former co-executor lacked standing to contest the second codicil. (*Jay v. Superior Court, supra,* 10 Cal.App.3d at p. 756.) The Court of Appeal explained: "It has also been held in California that an executor could also *contest* a subsequent will, even though he had no beneficial interest in the estate. (*Estate of Costa* [(1961)] 191 Cal.App.2d 515; *Estate of Langley* [(1903)], 140 Cal. 126.) The right is not based upon any pecuniary interest of the executor in the devolution of the estate, but rather upon the theory that he represents those who would be entitled to the estate under the will in which he is named as executor, and, in a representative capacity, he has the right to see that the testator's wishes are not thwarted by admission to probate of a testamentary paper which is not genuine. But *Costa* and *Langley, supra,* do not directly deal, either in the facts or the holding, with the instant case wherein the subsequent document effects no changes in the dispositive provisions, and only changes an executor; and we have found no California authority, and none is cited, which holds that in such a case an executor may contest the subsequent will or codicil." (*Jay,* at p. 758.) The Court of Appeal held the former co-executor's only legal interest was in receiving

15

administrative fees for his estate-related services.  (*Id.* at p. 759.)  This interest was insufficient to make the former co-executor an interested person with standing to contest the second codicil.  (*Ibid.*; see *Estate of Baird* (987) 196 Cal.App.3d 957, 965-966.)

Similar to the second codicil challenged in *Jay,* the one in the present case revoked Mr. Rose's nomination, replacing him with the co-executors.  Like the second codicil in *Jay*, the one here made no change in the disposition of Ms. Sobol's property.  Mr. Rose lacks standing to contest the codicil as a former executor of the estate.  (*Estate of Baird, supra,* 196 Cal.App.3d at p. 966 [decedent's mother lacked standing to contest appointment of decedent's widow as executor where estate had no assets]; *Estate of Getty, supra,* 85 Cal.App.3d at pp. 759-761 [contingent testamentary trustee lacked standing to contest last codicil to will because the pecuniary interest of the beneficiary was not impaired]; *Jay v. Superior Court, supra,* 10 Cal.App.3d at pp. 758-759.)

The objectors also argue the probate court has the inherent power and duty to determine whether the codicil was procured by undue influence irrespective of a contestant's standing.  They assert Ms. Shaylin committed elder abuse and breached her fiduciary duties.  The objectors argue Ms. Shaylin will spend trust resources at her discretion, insulated from any recourse by the intended beneficiary, the State of Israel.  Under the trust, the co-executors have discretion as to the creation of the Efim Sobol Foundation.  As noted, the foundation is to support medical research and education, and development of a hospital in Israel.

Even at the outset, we note no evidence supports the assertion any of the three co-executors have any intention of contravening Ms. Sobol's testamentary intentions.  Even if we accept the objectors' allegations as to Ms. Shaylin, there is no evidence of misconduct by the other two co-executors, Ms. Diehl and Dr. DaCosta-Iyer.  There is no evidence Ms. Diehl or Dr. DaCosta-Iyer committed elder abuse or exercised undue influence over Ms. Sobol.  Ms. Diehl knew Ms. Sobol since 2003.  Ms. Diehl managed an apartment building owned by the decedent.  Dr. DaCosta-Iyer knew Ms. Sobol since 2007.  Dr. DaCosta-Iyer was a close friend of Ms. Sobol's son, Dr. Sobol.  There is no evidence Ms. Diehl and Dr. DaCosta-Iyer would not carry out Ms. Sobol's wishes as co-

trustees and co-executors.  In addition, the Attorney General, who has notice of the probate proceedings, is obligated to protect the interests of charitable trust beneficiaries.  (*Arman v. Bank of Am., supra,* 74 Cal.App.4th at p. 704-705; *Estate of Getty, supra,* 85 Cal.App.3d at p. 761, fn. 5.)  There is no admissible evidence to support the assertion at oral argument the Attorney General is now incapable of fulfilling her statutory obligations to monitor charitable trusts.

Finally, nothing prevents the probate court on its own motion from raising the undue influence challenge.  (See *Estate of Lind*, *supra*, 209 Cal.App.3d at pp. 1436-1437.)  We respectfully disagree with the obiter dictum in *Estate of Lind* that suggests the probate court is *obligated* to raise the issue on its own motion.  (*Ibid.*)  We leave any such considerations in that regard in the hands of the probate court and the Attorney General.

## IV.  DISPOSITION

The orders under review are affirmed.  Terry D. Shaylin, Dolores Diehl and Dr. Maria Gracita DaCosta-Iyer, as co-executors of the estate of Sonia Sobol, shall recover their costs on appeal from the objectors, Jay Rose and Fred Maidenberg.

**CERTIFIED FOR PUBLICATION**


TURNER, P. J.


We concur:



MOSK, J.                                         KRIEGLER, J.


17