Filed 11/2/22  Frink v. Sims CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| SAMUEL E. FRINK, as Executor, etc., | C095127 |
| Plaintiff and Appellant, | (Super. Ct. No. 29473) |
| v. | |
| DEBORAH WEAVER SIMS, Individually and as Trustee, etc., | |
| Defendant and Respondent. | |

This appeal concerns the validity of a trust created by Barbara Weaver.[1]  The trust provides that, upon Barbara's death, 37.5 percent of the trust estate is to be distributed to her daughter, Barbara Jean Weaver, but not outright.  Instead, Barbara Jean's share is to be held in trust, and distributed to her at the rate of $400 per month.

---

[1]  Because so many of the parties in this case share the same last name, we refer to each individual by his or her full name in the first instance, and thereafter by his or her first name only.  No disrespect is intended.

After her mother's death, Barbara Jean filed a petition to invalidate the trust, claiming (1) her mother lacked capacity to execute the trust because she was cognitively impaired, and (2) her sister, Deborah Weaver Sims, took advantage of this cognitive impairment to unduly influence their mother into disbursing only $400 per month to Barbara Jean. The trial court rejected both claims and found Barbara had capacity to execute the trust and that it was not procured by Deborah's undue influence. This appeal followed, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The following is an abbreviated version of the facts that are relevant to the issues raised in this appeal. Additional facts are provided in the discussion sections, *post*. In recounting the facts, we rely heavily on the trial court's thorough statement of decision, which contains numerous factual findings that are not challenged on appeal. The findings that are challenged will be discussed in more detail, *post*.

*A. The Trust*

In 2002, Barbara created a trust that provided for the distribution of her trust estate after her death. The trust was amended in September 2007 (the first amendment), and again in October 2011 (the second amendment). Only the validity of the second amendment is at issue here.

As originally executed, the trust named Barbara and her daughter Deborah as trustees. Barbara was the sole beneficiary during her lifetime. After her death, Barbara's three living children—Deborah, Barbara Jean, and Richard Weaver—and her grandson Daniel Scheidecker would each receive 25 percent of the trust estate. Daniel is Barbara Jean's son, and he was 12 years old at the time the trust was executed. According to Deborah, Barbara wanted to leave something to Daniel to make sure he was taken care of. Deborah and her brother Richard were financially responsible, had assets, and would be able to take care of their children and leave them an inheritance. Barbara Jean, in contrast, had issues with drinking, drugs, and gambling, and she was not financially

2

stable, having previously filed for bankruptcy and lost her home. Barbara felt her other grandchildren would be taken care of and Daniel would not.

In 2007, Barbara told Deborah she wanted to make changes to her trust. Because Deborah was a cotrustee, Barbara asked her to attend a meeting with attorney Justin Arel to discuss those changes. Arel prepared the first amendment to the trust, and it was signed by Barbara and Deborah on September 13, 2007. The first amendment changed the distribution of trust assets after Barbara's death, as follows: 25 percent to Richard, and 37.5 percent each to Deborah and Barbara Jean. According to Deborah, Barbara eliminated the 25 percent distribution to Daniel because she had given Barbara Jean some money toward a down payment on a house, and Barbara Jean told her mother she would be putting Daniel's name on the title. Barbara believed there was significant equity in the house, and that Daniel now had a potential inheritance upon Barbara's Jean's death.

In or around September of 2011, Barbara told Deborah she had made an appointment with Arel to discuss more changes to her trust, and she asked Deborah to go with her. Barbara did not tell Deborah what specific changes she wanted to make. Barbara and Deborah met with Arel on September 20, 2011. Barbara first talked to Arel alone, and Deborah was then invited into the meeting.

Deborah testified that Barbara and Arel discussed ways Barbara could provide financial help to Barbara Jean after Barbara died. Barbara had recently learned the house she helped Barbara Jean purchase had been lost to foreclosure, and she was concerned that Barbara Jean's addictive behaviors—"including gambling, alcohol and/or drugs"— and poor choices had resulted in financial difficulties again. Barbara was worried Barbara Jean would end up homeless and she wanted to provide some support to make sure she had a roof over her head, but she was concerned that if she left Barbara Jean a lump sum outright, Barbara would lose it all gambling.

Deborah recalled that Barbara also told Arel she wanted to be financially independent, she did not want to be a burden to her children, and she understood there

3

would be a point in her life where she would need to move to an assisted living facility, which could be expensive.  Barbara and Arel discussed Barbara's life expectancy (she was 84 at the time), which Barbara believed might be close to 100 because many people in her family lived that long.  Barbara told Arel she was planning on living to 100, and she wanted to make sure she was well taken care of.  Barbara and Arel discussed how much money Barbara would need to live comfortably for the rest of her life, and also leave a monthly sum to Barbara Jean after she died.  The sum they came up with for Barbara Jean was $400 a month.

Deborah also testified her mother told Arel she wanted the $400 a month to go to Daniel if there was any money left when Barbara Jean died.  Barbara told Arel she had recently found out Barbara Jean had lost her house, and Daniel thus would no longer be inheriting it.  Because Daniel was the only grandchild who would not have an inheritance, Barbara told Arel she wanted to provide something for him:  "My daughter comes first, and I want her taken care of.  But should she pass, . . . I want the . . . $400-a-month payment . . . to go to . . . Danny."

Arel did not have any specific recollection of Barbara, but he had notes of his meetings with her, and he testified about his usual practices with clients.  Arel's notes state "daughter, Barbara Jean, age 58, neck/feet & back injury, state disability, Costco 20+ years, 401(k), $ problems, gambling, unable to manage $"; "ongoing issues w[ith] daughter Barbara Jean loans &/or gift$, trust for Barbara, security, $400/month, long term supplement to Barbara's retirement & SS [i.e., Social Security]."  The notes also state Barbara's trust is to be amended to "Add" a "trust for Barbara Jean Weaver.  Trustee shall distribute $400/per month from net income & principal."  Arel testified he "typically" would not have suggested the $400 per month figure, but he would have discussed the feasibility of that figure with Barbara in light of her existing assets and what she would need to live comfortably for the rest of her life.

4

Arel prepared the second amendment to the trust, and Barbara and Deborah signed it on October 20, 2011.  It provides the trust estate is to be distributed as follows: 25 percent to Richard outright; 37.5 percent to Deborah outright; and 37.5 percent to Barbara Jean, but not outright.  Instead, Barbara Jean's share is to be held in a separate trust administered for her benefit, and the trustee "shall distribute $400.00 per month from net income and principal of the trust estate to the beneficiary.  The trustee shall accumulate and add to principal any net income not distributed.  If the beneficiary dies, the trustee shall distribute $400.00 per month from net income and principal of the remaining trust estate equally to the issue of BARBARA JEAN WEAVER, if any, in the manner provided in California Probate Code section 246, or if the beneficiary leaves no issue then among trustors' heirs."[2]  The second amendment also provides, "The trust shall terminate on the death of the beneficiary," and "If the trust property is not completely disposed of by the proceeding provisions, the undisposed-of portion shall be distributed outright as follows:  one half (1/2) to the heirs of the deceased trustor and one half (1/2) to the heirs of the surviving trustor."[3]

### B.  Barbara's Cognitive Issues

In early 2011, before the second amendment was executed, Deborah began noticing her mother was forgetting things.  On one occasion, Barbara told Deborah she

---

[2]  Probate Code section 246 provides:  "Where a will, trust, or other instrument calls for property to be distributed . . . 'in the manner provided in Section 246 of the Probate Code,' the property to be distributed shall be divided into as many equal shares as there are living children of the designated ancestor, if any, and deceased children who leave issue then living.  Each living child of the designated ancestor is allocated one share, and the share of each deceased child who leaves issue then living is divided in the same manner."  (Prob. Code, § 246, subd. (a).)

[3]  Arel testified this was an error.  It is a common clause used to disperse the residue of a husband and wife trust when one spouse dies.  In this case, however, there is only one trustor (i.e., Barbara).

had left a stove burner on.  On another occasion, Barbara thought her mother had forgotten whether she had taken her medication and thus may have been taking it more frequently than she should have.

Deborah generally accompanied her mother to doctor's appointments.  At a regularly scheduled appointment in March 2011, Deborah told Barbara's physician, Dr. Gurpeet Sandhoo, that her mother was having issues with memory.  Dr. Sandhoo performed a mini-mental state examination (MMSE), and Barbara scored 24 out of 30.  Dr. Sandhoo testified this test showed Barbara had a "little deficit" in "[s]hort-term memory," "[b]ut cognitively, she did okay."  Dr. Sandhoo recommended that Barbara be evaluated at the Memory and Aging Center at University of California San Francisco (UCSF).

Barbara was evaluated at UCSF on August 18, 2011, by Dr. Zachary Miller, who prepared a detailed report of his evaluation.  Dr. Miller's report noted Barbara was experiencing some cognitive decline, and his impression was that Barbara's "pattern of deficits is consistent with a diagnosis of mild dementia, most likely related to the early stages of Alzheimer's disease."

On Dr. Miller's recommendation, an MRI of Barbara's brain was performed on September 16, 2011, and it showed some atrophy.  Dr. Sandhoo testified that atrophy "is a sign of aging.  Everybody has it as we get older."  She testified it was not uncommon for individuals over 80 to have short-term memory deficits.  She also testified the type of dementia Barbara had was late onset and had a very slow progression, and you would not notice any dementia or memory loss if you were talking to her.  Finally, she testified Barbara remained capable of making rational decisions in 2011.

In late 2011, Barbara moved in with Deborah, and lived with her until June of 2013, when she moved to a facility called The Vistas.  She initially lived in the "assisted living" or "regular" section of the facility, where she was allowed to come and go as she

6

pleased. About six months before she died, she moved to the "memory care" section of the facility. She died on February 27, 2017, at the age of 90.

*C. Trial Court Proceedings*

Barbara Jean first learned about the second amendment to the trust after her mother died, and she became convinced Deborah had taken advantage of their mother's declining cognitive abilities and convinced her to amend her trust. Barbara Jean filed a petition seeking to invalidate the second amendment due to lack of capacity and undue influence. Deborah was named as respondent, both individually and in her capacity as trustee. The petition also asserted claims against Deborah for breach of trust, unjust enrichment, conversion, breach of fiduciary duty, and elder abuse.

The petition was filed on January 12, 2018. Barbara Jean died on April 15, 2018, and Samuel E. Frink, who had been appointed the executor of Barbara Jean's estate, was substituted in as petitioner (we refer to him as Petitioner).

A three-day bench trial on the equitable issues raised by the petition was held in January 2021. In his trial brief, Petitioner stated, "based upon the discovery in this matter, [Petitioner] does not believe the evidence supports the allegation that [Barbara] lacked capacity at the time of the execution of the Second Amendment to Trust and, accordingly, will not present any evidence or argument at trial on such equitable issue." At the outset of the trial, Petitioner confirmed the only issue before the court was whether Barbara was subject to undue influence.

The trial court issued a tentative statement of decision on April 1, 2021, denying the petition to invalidate the second amendment. One week later, Petitioner personally mailed two letters and two additional documents to the trial court. On April 20, 2021, the trial court issued an order noting it had received the documents but would not consider them because (1) Petitioner was represented by counsel and had to communicate through counsel, (2) the documents were not submitted in a format suitable for filing, and (3) the documents contained information and evidence that was not presented at trial. On May 4,

7

2021, Petitioner's counsel filed "supplemental objections" to the tentative statement of decision that attached the documents, presumably to ensure they were filed.[4] In the final statement of decision, the trial judge noted these documents "contain[] a significant amount of information . . . which was not presented as evidence at the time of trial. As such, the Court . . . cannot consider this extraneous information."

The trial court's final statement of decision is thorough and well-reasoned. It concluded that Petitioner failed to establish undue influence. It also noted that although Petitioner had stated he was not proceeding on a lack of capacity theory, he nonetheless re-asserted that theory in his closing brief. The trial court found Petitioner had waived the issue, but nonetheless addressed it "out of an abundance of caution," and found Barbara had capacity. The trial court thus denied the petition to invalidate the second amendment to the trust.

The parties thereafter stipulated for entry of judgment in favor of Deborah and against Petitioner on all causes of action, prayers and relief sought in the petition because the trial court's findings on capacity and undue influence "would preclude the establishment of findings necessary to support any cause of action based on legal issues." Judgment was entered on August 31, 2021, and this appeal followed.

## DISCUSSION

Before turning to the merits of this appeal, we note Petitioner is currently proceeding in propria persona. A party proceeding in propria persona, however, is entitled "to no greater privilege or advantage than that given to one represented by counsel." (*Deauville v. Hall* (1961) 188 Cal.App.2d 535, 547.) "[I]in electing to represent himself 'he assumes for all purposes connected with his case, and must be prepared to be treated as having, the qualifications and responsibilities concomitant with

---

[4] The supplemental objection contained no actual objections; the only thing it did was attach the four documents Petitioner had previously mailed to the court.

8

the role he has undertaken; he is not entitled either to privileges and indulgences not accorded attorneys or to privileges and indulgences not accorded defendants who are represented by counsel.' " (*Ibid*.) In order to ensure we consider Petitioner's appeal on the merits, we will liberally construe his opening brief.[5] (See *People v. Mitchell* (1962) 209 Cal.App.2d 312, 315.) However, we cannot excuse a failure of proof at trial or a failure of argument on appeal.

# I

## *Standard of Review*

Whether undue influence has been exerted is a question of fact, and we review the trial court's findings thereon under the substantial evidence standard. (*In re Marriage of Dawley* (1976) 17 Cal.3d 342, 354-355; *Estate of Gelonese* (1974) 36 Cal.App.3d 854, 863.) The trial court's findings regarding capacity are also reviewed under the substantial evidence standard. (*Estate of Clegg* (1978) 87 Cal.App.3d 594, 600-601; *Estate of Teed* (1952) 112 Cal.App.2d 638, 643-644.) The substantial evidence standard is deferential to the trial court's findings and judgment. "When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.*" (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

---

[5] He did not file a reply brief.

In determining whether the trial court's findings are supported by substantial evidence, we "look to the entire record of the appeal" and we do not limit our review " 'to isolated bits of evidence selected by [Petitioner].' " (*Bowers v. Bernards, supra*, 150 Cal.App.3d at p. 873, italics omitted.)  "We view factual matters most favorably to [Deborah] and in support of the judgment," and "we resolve all conflicts in the evidence in favor of [Deborah]." (*Estate of Auen* (1994) 30 Cal.App.4th 300, 311.)  "The testimony of a single witness may constitute substantial evidence as long as it is not physically impossible or inherently improbable," (*DeNike v. Mathew Enterprise, Inc.* (2022) 76 Cal.App.5th 371, 381), and this is true even if the witness is a party to the action, (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614).  We do not reweigh the credibility of witnesses.  "The trial court . . . was able to assess credibility and resolve any conflicts in the evidence.  Its findings . . . are entitled to great weight." (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479.)

We note preliminarily that Petitioner frequently supports facts by citing the four documents he submitted to the trial court *after* the trial concluded and that thus were not admitted into evidence.  As noted above, the trial court did not consider these documents.  Petitioner agues this was error because the documents were submitted *before* the final statement of decision was issued.  The trial court did not err in refusing to consider these documents.

In a bench trial, the trial court acts as the finder of fact, and it is axiomatic that the finder of fact must decide what the facts are based solely on the evidence introduced at trial.  It would have been reversible error for the trial court to consider evidence that was not offered at trial in reaching its decision in this case.[6]  And just as the trial court could

---

[6]  A trial court may consider evidence that was not offered at trial if it grants a motion for a new trial pursuant to Code of Civil Procedure section 657.  One of the grounds for granting such a motion is "[n]ewly discovered evidence, material for the party making the

not consider evidence that was not offered at trial, we cannot consider such evidence on appeal. "It is axiomatic that . . . we may not review exhibits . . . not admitted at trial." (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 815.) "Facts, events, documents or other matters urged by a party which are not admitted into evidence cannot be included in the record on appeal. They are outside the scope of review." (*USLIFE Savings & Loan Assn. v. National Surety Corp.* (1981) 115 Cal.App.3d 336, 343.) Thus, like the trial court, we cannot consider these documents.

## II

### *Analysis*

We begin by noting that, "[a]s a general proposition, California law allows a testator to dispose of property as he or she sees fit without regard to whether the dispositions specified are appropriate or fair." (*Estate of Sarabia* (1990) 221 Cal.App.3d 599, 604.) The right to dispose of one's property as one sees fit is "fundamental" and " 'is most solemnly assured by law, and . . . does not depend upon its judicious use.' " (*Estate of Fritschi* (1963) 60 Cal.2d 367, 373.) Thus, so long as she had capacity and was not unduly influenced, Barbara could dispose of her trust estate however she wanted, and regardless of whether the result appears fair, appropriate, or judicious.

We also note at the outset that Petitioner concedes "Barbara Jean had a gambling problem," and she "knew that if she were to receive a large sum of money she would likely lose it to her gambling habits." He also concedes a monthly disbursement "was perfectly justified," and "[t]here was never a dispute over a monthly payment to Barbara

---

application, which he could not, with reasonable diligence, have discovered and produced at the trial." (Code Civ. Proc., § 657.) Petitioner, however, did not file a motion for a new trial based on newly discovered evidence. Moreover, none of the information he provided to the trial court was newly discovered. Instead, it is all evidence he states he gave to his attorney prior to trial, but that his attorney failed to use.

Jean."  Finally, he states the only dispute in this case concerns the amount of the monthly disbursement.

   A.  *Lack of Capacity*

Capacity to make a will or a trust is presumed to exist, and it was Petitioner's burden to overcome that presumption.  (Prob. Code, § 810, subd. (a) ["there shall exist a rebuttable presumption affecting the burden of proof that all persons have the capacity to make decisions and to be responsible for their acts or decisions"]; *Estate of Fritschi, supra*, 60 Cal.2d at p. 372 ["The testator is presumed sane and competent and the burden rests on the contestant to overcome this presumption"]; *Estate of Agnew* (1944) 65 Cal.App.2d 553, 559-560 ["Testamentary capacity is always presumed to exist until the contrary is established"].)

Capacity to make a will can be—but is not always—the same as capacity to make a trust.  Probate Code section 6100.5 provides a person has capacity to make a will if they understand (1) the nature of the testamentary act, (2) the nature and situation of their property, and (3) who their relatives are.  (Prob. Code, § 6100.5, subd. (a).)  Capacity to make a will has been described as "exceptionally low."  (*In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 641.)  " 'It is well established that "old age or forgetfulness, eccentricities or mental feebleness or confusion at various times of a party making a will are not enough in themselves to warrant a holding that the testator lacked testamentary capacity." ' " (*Andersen v. Hunt* (2011) 196 Cal.App.4th 722, 727.)  " 'Care must be taken to differentiate between mere unreasonable opinions and [lack of testamentary capacity].  Testamentary capacity does not depend upon the testatrix' ability to reason logically or upon her freedom from prejudice.  A belief may be illogical or preposterous, but it is not, therefore, evidence of [lack of testamentary capacity].' " (*Estate of Lingenfelter* (1952) 38 Cal.2d 571, 582.)

In contrast to testamentary capacity, what might be called general capacity is governed by Probate Code sections 810 through 812, which deal with capacity to make

12

contracts, conveyances, and medical decisions, to marry, and to execute trusts.[7] "Probate Code sections 810 through 812 do not impose a single standard of contractual capacity," and instead provide "that capacity be evaluated in light of the complexity of the decision or act in question." (*Lintz v. Lintz* (2014) 222 Cal.App.4th 1346, 1352.) In *Andersen v. Hunt*, the court held that capacity to execute a trust is governed by Probate Code section 6100.5 rather than by Probate Code sections 810 through 812 when the trust "closely resembles" or is "analogous to" a will or codicil. (*Andersen v. Hunt, supra*, 196 Cal.App.4th at p. 731; see also *Gomez v. Smith* (2020) 54 Cal.App.5th 1016, 1037-1038.)

The trial court found the second amendment to the trust was analogous to a will or codicil and the capacity standard set forth in Probate Code section 6100.5 thus applied, and Petitioner does not challenge this finding on appeal. The trial court went on to conclude Barbara had capacity to execute the second amendment because she (1) understood the nature of the testamentary act, (2) understood the nature and situation of her property and assets, and (3) knew who her relatives were, and, indeed, had provided for her living children and her grandchildren in her trust.

Although Petitioner does not directly attack the three underlying findings, he does argue the trial court's conclusion that Barbara had capacity is not supported by the evidence. In particular, he argues (1) only two witnesses—Dr. Miller and Dr. David

---

[7] Probate Code section 810 establishes a rebuttable presumption that all persons have capacity to make decisions and be responsible for their actions. Probate Code section 811 provides a determination that a person lacks capacity must be supported by evidence of a deficit in certain mental functions that significantly impairs the person's ability to understand the consequences of the decision in question, and evidence of a correlation between the deficit and the decision. And Probate Code section 812 provides a person lacks capacity to make a decision unless they have the ability to communicate the decision and to understand and appreciate (1) the rights, duties, and responsibilities of the decision, (2) the probable consequences of the decision, and (3) the significant risks, benefits, and alternatives involved in the decision.

McGee-Williams—were qualified to opine about Barbara's capacity, and (2) both witnesses opined Barbara lacked capacity to execute the second amendment. We disagree with Petitioner on both counts and determine the trial court's findings and conclusion are amply supported by the evidence.

At trial, Dr. Sandhoo and attorney Arel both testified Barbara had capacity to execute the second amendment. Dr. Sandhoo testified she had been Barbara's personal physician for several years. She was aware of and evaluated Barbara's memory loss and cognitive issues. Although Dr. Sandhoo acknowledged she was not a neurologist, in her judgment, Barbara had the capacity to make rational decisions in 2011. Arel testified he was Barbara's lawyer, and he prepared the second amendment. He has been an estate lawyer for 25 years and he specializes in wills, trusts, and probate matters. He testified a majority of his clients are "senior citizens," and their "[c]apacity plays a role in every document we prepare." In order to assess capacity, he engages with each client and asks questions to determine whether the client understands the particular decision being made. He goes through the client's assets, and their general awareness of their family and affairs. He testified there are times when it is evident a client does not have capacity, and in those cases, "we're just no longer able to change any documentation." If he has any question about a client's capacity, he recommends a medical evaluation or a mental assessment. He testified that, based on the details of his notes, he had "quite an engagement with [Barbara] regarding [the second] amendment" and its consequences, and he "was confident that she was competent to execute the documents at that time." And again: "Based on my notes, . . . my opinion was she had capacity at that time in 2011."

Even lay witnesses may offer their opinions of a person's capacity, although such opinions "are no stronger than the reasons given for them." (*Estate of Dupont* (1943) 60 Cal.App.2d 276, 285; see also *Estate of Dobrzensky* (1951) 105 Cal.App.2d 134, 139 [while not determinative, opinion of physician or intimate acquaintance is relevant to

14

issue of capacity]; *Estate of Buthmann* (1942) 55 Cal.App.2d 585, 591 ["it is well settled that while non-expert as well as expert witnesses may give their opinions on the issue of competency, it is not the mere opinions which are of importance but the reasons given in support of such opinions"]; Evid. Code, § 870 [intimate acquaintance may offer opinion on mental capacity].)  Petitioner fails to convince us that Dr. Sandhoo and Arel were not qualified to offer their opinions about Barbara's capacity to execute the second amendment.

Petitioner is also incorrect when he argues Dr. Miller opined Barbara lacked capacity to execute the second amendment.  Dr. Miller offered no opinion on Barbara's capacity to execute the second amendment, either in his report or during his testimony at trial.  He testified there are physicians and other professionals who perform capacity evaluations or examinations to determine whether someone has the capacity to make certain decisions, but he did not perform a capacity evaluation on Barbara.  Dr. Miller also testified Barbara would have known who her children were, would probably have known what her assets were (although she might not know her bank account number), and he could not say one way or the other whether she would be able to understand the effect of signing legal documents.

Dr. McGee-Williams is a clinical neuropsychologist retained by Petitioner to offer expert testimony on brain function and dementia.  He did testify Barbara was not competent to understand the second amendment, but he did not explain why other than to state "understanding what's going on in a trust is fairly complex," that even he would have a hard time understanding Barbara's trust, and "[t]hat's why we have people like you guys [i.e., lawyer] to tell us . . . what it means."  That the second amendment may have been complex or difficult for a lay person to understand does not prove Barbara lacked capacity to execute it.  "If precise knowledge of the laws of succession were necessary for testamentary capacity, only judges and lawyers could be testators, and they, not always."  (*Estate of Goulart* (1963) 222 Cal.App.2d 808, 816.)  Moreover, although

15

some aspects of the second amendment may have been complex,[8] there is no suggestion that the second amendment did not accurately reflect Barbara's relatively uncomplex decision to place Barbara Jean's share of the estate in a trust to be paid out at a rate of $400 per month, or that she lacked capacity to make that decision.

Dr. McGee-Williams's opinion was also undercut by the fact that he did not know Barbara Jean had a gambling problem. When informed of Barbara Jean's gambling problem, Dr. McGee-Williams acknowledged, "It may make perfect sense to limit her money. Whether or not Barbara Weaver understood the . . . actual structure of what she was doing . . . *I don't know*." (Italics added.) Dr. McGee-Williams's testimony fails to rebut the presumption that Barbara had capacity to execute the second amendment to the trust.

Finally, and importantly, it was for the trial court to determine how much weight to give Dr. McGee-Williams's testimony, and it appears the trial court did not give it much weight. The trial court noted, for example, that Dr. McGee-Williams never examined Barbara, and only reviewed her records, and that this was unusual because "for about 99% of his evaluations he actually sees the patient." It also noted Dr. McGee-Williams believed Barbara's cognitive impairment was more severe than either of two doctors who had actually examined her (i.e., Dr. Sandhoo and Dr. Miller). Finally, it noted Dr. McGee-Williams's opinions were based, in part, "on [his] being advised that Barbara went into a memory unit in 2013. However, this assumption is incorrect. The evidence was that Barbara went into assisted living in 2013, but did not go into the memory care wing of the facility until late 2016, approximately 5 years after her assessment by Dr. Miller and evaluation by Dr. Sandhoo." "Where an expert bases his conclusion upon assumptions which are not supported by the record, . . . then his

---

[8] For example, Arel testified Barbara Jean's trust could create complex tax reporting issues.

16

conclusion has no evidentiary value." (*Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.)  We will not second guess the trial court's determination about how much weight to give Dr. McGee-Williams's testimony.  (See *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 614 ["In reviewing a claim of insufficiency of evidence, the appellate court must . . . defer to the trier of fact's determination of the weight and credibility of the evidence"].)

Petitioner would have us ignore the evidence that supports the trial court's finding that Barbara had capacity to execute the second amendment, and to consider only the evidence that would support a contrary finding.  This, however, is "contrary to established precepts of appellate review."  (*Hjelm v. Prometheus Real Estate Group, Inc.* (2016) 3 Cal.App.5th 1155, 1166.)  Again, if substantial evidence supports the trial court's finding, the fact that other evidence would support a contrary finding is "of no consequence."  (*Bowers v. Bernards, supra*, 150 Cal.App.3d. at p. 874, italics omitted.) "Our power 'begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion' reached by the trier of fact."  (*Estate of Auen, supra*, 30 Cal.App.4th at p. 311.)  Substantial evidence supports the trial court's conclusion that Barbara had capacity to execute the second amendment to the trust.

### B.  Undue Influence

"California courts have long held that a testamentary document may be set aside if procured by undue influence."  (*David v. Hermann* (2005) 129 Cal.App.4th 672, 684.) "Undue influence is pressure brought to bear directly on the testamentary act, sufficient to overcome the testator's free will, amounting in effect to coercion destroying the testator's free agency."  (*Rice v. Clark* (2002) 28 Cal.4th 89, 96.)  It "consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating on it; some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of

17

his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment." (*Estate of Ricks* (1911) 160 Cal. 467, 480.)

The person challenging the testamentary document (here, Petitioner) bears the burden of proving undue influence. (*Rice v. Clark, supra*, 28 Cal.4th at p. 96.) However, "a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument." (*Id.* at p. 97.) "All three of these factors must be present in order to have the benefit of the presumption." (*Estate of Gelonese, supra*, 36 Cal.App.3d at p. 862.) "If this presumption is activated, it shifts to the proponent of the will [or trust] the burden of producing proof by a preponderance of evidence that the will [or trust] was not procured by undue influence. It is for the trier of fact to determine whether the presumption will apply." (*Estate of Sarabia, supra*, 221 Cal.App.3d at p. 605.)

### i. The Presumption of Undue Influence

Here, the trial court found Petitioner failed to raise a presumption of undue influence because although Deborah had a confidential relationship with Barbara (factor No. 1), there was no evidence Deborah was actively involved in procuring the second amendment (factor No. 2), and no evidence she unduly benefited from it (factor No. 3). It is unclear whether Petitioner challenges the trial court's finding that he failed to raise a presumption of undue influence, because he never mentions the presumption in his brief. He does argue the trial court's finding that the second amendment does not result in a financial benefit to Deborah is contrary to the evidence, so we will assume he challenges the trial court's finding to the contrary, and we will discuss that finding below. We note, however, that a presumption of undue influence does not arise unless the challenger

18

proves all three factors exist, and substantial evidence supports the trial court's finding that Deborah was not actively involved in procuring the second amendment.

Deborah testified she had nothing to do with the second amendment, and, as noted above, the testimony of a single witness may constitute substantial evidence of a fact. (*DeNike v. Mathew Enterprise, Inc., supra*, 76 Cal.App.5th at p. 381.) Petitioner suggests Deborah lied when she testified that she had nothing to do with the second amendment. The trial court, however, believed Deborah's testimony, and it is not for us to second guess that decision. "Except in these rare instances of demonstrable falsity, doubts about the credibility of [an] in-court witness should be left to the [trier of fact's] resolution." (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.) " 'To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of facts upon which a determination depends. [Citations.]' " (*Evje v. City Title Ins. Co.* (1953) 120 Cal.App.2d 488, 492.) Deborah's testimony that she had nothing to do with the terms of the second amendment is neither physically impossible nor apparently false, and, perhaps more importantly, the trial court credited her testimony. There are thus no grounds for us to reject her testimony.

Petitioner also accuses Deborah of another lie that is arguably related to the trial court's finding that Deborah was not involved in creating the second amendment. According to Petitioner, Deborah testified it was Barbara's attorney Arel who came up with the amount of Barbara Jean's monthly payment. Petitioner focuses on the following isolated portion of Deborah's testimony:

"Q.     Let me ask you this. [¶] Who broached the subject of giving a $400-a-month payment to your sister from her share of the trust -- inheritance?

19

"A. Would you like that answer now or what led up to that?

"Q. Well, answer the question, and then we'll see.

"A. Okay. *Mr. Arel.*" (Italics added.)

Petitioner contends the italicized testimony is a "direct lie" told by Deborah in order to " 'blame' " Arel "for the tiny $400/month distribution and hide the . . . fact that [Deborah] influenced her mother to name this amount." As evidence of this lie, Petitioner points to Arel's testimony that he "typically" would not have suggested a monthly amount. The fact that Arel "typically" would not have suggested a monthly amount, however, does not demonstrate Deborah lied.

Moreover, Petitioner has selectively focused solely on evidence that supports his arguments. He thus "ignores a fundamental rule of appellate practice obligating him to completely and fairly summarize the evidence supporting the court's findings and judgment." (*Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 571.) In doing so, Petitioner conveniently ignores Deborah's complete testimony on this issue. According to Deborah, her mom initially told Arel "I've decided that I want to leave everything to Debbie and have Debbie have her share and Barbara Jean's share. . . . And anytime that Barbara Jean needs something, she'll have to go to Debbie and ask her for it." Deborah told her mom she was not willing "to play banker" to Barbara Jean or be in charge of giving her money because that would destroy their relationship. Arel "agreed that that was not a good plan." Arel then suggested Barbara could "make a trust within the trust that would give [Barbara Jean] . . . a monthly amount," and "that was the route [Barbara] elected to go with." As for how the monthly amount was set, Deborah testified her mom and Arel spent quite a bit of time discussing her mom's finances and current assets, what nursing homes or assisted living facilities cost, and how much her mom would need to live comfortably for the rest of her life. Barbara also told Arel she thought Barbara Jean's rent was currently $600 a month, that Barbara Jean had a retirement account and would eventually receive Social Security, that Barbara Jean "should be able

20

. . . to live off . . . what she has," and that her mom wanted to leave Barbara Jean "enough to help partially . . . cover her rent." According to Deborah, based on this discussion, "*they* came to a number of $400 a month," (italics added), and "*they* arrived at that figure," (italics added). Viewed in context, Deborah thus did not testify Arel came up with the $400 a month figure. Instead, she testified Arel came up with the idea of creating a trust for Barbara Jean that would provide her with a monthly payment, and her mom and Arel both came up with the amount of that payment.

Petitioner thus fails to demonstrate the trial court erred in finding no presumption of undue influence had been raised.

### ii. *Evidence of Undue Influence*

Having failed to raise a presumption of undue influence, Petitioner had the burden of proving it. This burden has been described as "heavy," (*Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545), and as requiring "a *strong showing*," (*Estate of Ventura* (1963) 217 Cal.App.2d 50, 58). " '[U]ndue influence can be established by circumstantial evidence so long as the evidence raises more than a mere suspicion that undue influence was used; the circumstances proven must be inconsistent with the claim that the will was the spontaneous act of the testator.' [Citation.] Clear and convincing proof is required. [Citation.] Undue influence will not be inferred from 'slight evidence.' [Citations.]" (*Estate of Truckenmiller* (1979) 97 Cal.App.3d 326, 334.)

Petitioner's primary argument is that the second amendment to the trust financially benefits Deborah. The fact that the person accused of undue influence will benefit or profit from the testamentary document can be evidence of undue influence (although it is not dispositive). (*Estate of Muller* (1936) 14 Cal.App.2d 129, 132.) Conversely, the fact that the person charged with undue influence will not actually benefit tends to refute the charge. (*Estate of Ventura, supra*, 217 Cal.App.2d at pp. 58-59.) The trial court found Deborah would not benefit from the second amendment, and this finding is supported by the evidence.

21

The terms of the second amendment do not establish that Deborah will personally benefit from it. (See *Estate of Bucher* (1941) 48 Cal.App.2d 465, 473 [benefit may be shown by terms of testamentary document].) The first amendment and the second amendment both entitle Deborah to 37.5 percent of the trust estate, and the second amendment did not increase Deborah's share of the estate at Barbara Jean's expense.

What is Petitioner's evidence of financial benefit to Deborah? It is difficult to tell. He states Deborah "is fighting to avoid a forensic audit" of the trust estate's assets and he implies that Deborah has undervalued those assets. He cites no evidence that this is true, and even if such evidence existed, he fails to explain how it shows Deborah financially benefits from the second amendment. If the trust assets are worth more, that simply means Deborah's, Barbara Jean's, and Richard's shares of the estate are worth more.

Although far from clear, Petitioner may contend that Deborah financially benefits from the second amendment because she is the trustee of Barbara Jean's trust and oversees its administration, and thus has the opportunity to pocket any amounts she does not distribute to Barbara Jean (or Daniel) or to simply take money from the trust for her own personal use. Assuming Petitioner does so contend, there is *no evidence* that Deborah has pocketed any portion of Barbara Jean's share or taken money from the trust.

Finally, Petitioner may contend Deborah will ultimately benefit from the second amendment because once Barbara Jean's trust terminates, any money remaining is distributed to Barbara's heirs, which would include Deborah. The trial court found Deborah had no reasonable expectation that she would ever receive a portion of Barbara Jean's trust, and this finding is supported by the evidence. The second amendment states Barbara Jean's trust terminates "on the death of the beneficiary," which could be interpreted to mean it terminates when Barbara Jean dies, but it appears *nobody* interpreted it this way because it also states, "If the beneficiary dies, the trustee shall distribute $400.00 per month . . . to the issue of BARBARA JEAN WEAVER." The trial court found this provision was ambiguous. Interpreted literally, it would mean Barbara

22

Jean's "issue" would continue to receive the $400.00 per month until the trust assets were completely distributed, and the term "issue" could include Daniel, his children, his children's children, and so on.[9] The trial court found that if the second amendment was interpreted this way, "Deborah would have no reasonable expectation that she would outlive her nephew and receive any portion of Barbara Jean's share." Deborah testified, however, and Arel confirmed, that Barbara's intent was that the $400 a month would be distributed to Daniel after Barbara Jean died, and not to Daniel's issue in perpetuity. The trial court thus found that, whichever way the second amendment was interpreted, "There is no reasonable interpretation of the instrument whereby Deborah would be entitled to any portion of Barbara Jean's share." The trial court thus concluded Deborah did not financially benefit from the second amendment, and this conclusion is supported by the evidence. It also "tends to refute the charge [of undue influence]." (*Estate of Ventura, supra*, 217 Cal.App.2d at pp. 58-59.)

Having failed to prove the second amendment benefits Deborah, Petitioner offers little evidence of undue influence. He argues the fact that Deborah did not give attorney Arel a copy of Dr. Miller's report is evidence of undue influence because it suggests she was trying to hide her mother's cognitive issues from him. We disagree. Although Deborah did not provide Arel with a copy of Dr. Miller's report, she testified she called Arel prior to the meeting to report her mother's cognitive issues, and Arel assured her he dealt with such issues all the time and would assess her mother's capacity when they met.

---

[9] The trial judge appears to have found that a monthly distribution to Barbara Jean's "issue" could be barred by the rule against perpetuities, which provides, "No interest in real or personal property shall be good unless it must vest, if at all, not later than 21 years after some life in being at the creation of the interest." (Civ. Code, § 715.2.) The trial court also appears to have found, however, that Barbara's intent was to continue the monthly disbursement to Daniel, but not to his issue in perpetuity. So interpreted, the second amendment would not violate the rule against perpetuities, because Daniel is a "life in being at the creation" of the second amendment.

Deborah's testimony is corroborated by Arel's notes of the meeting, which state "occasional memory short-term" problems. Contrary to Petitioner's assertion, Deborah did not try to hide her mother's condition from Arel.

Petitioner also argues Barbara's cognitive impairments rendered her "vulnerable" to undue influence, and he notes Dr. McGee-Williams testified that Barbara "would certainly be subject to undue influence." Being vulnerable or subject to undue influence, however, does not mean that undue influence actually occurred. "It is well settled . . . that a mere showing of opportunity to exert undue influence is not sufficient to support a finding that it was exerted." (*Estate of Dunne* (1955) 130 Cal.App.2d 216, 225; see also *Estate of Fritschi, supra*, 60 Cal.2d at pp. 373-374 [" 'mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient' "].)

Finally, Petitioner complains that he gave his attorney "specific evidence" about Deborah's undue influence, but this evidence "was not presented at trial."[10] Again, however, we may not consider any evidence that was not presented at trial.

The trial court found Petitioner failed to carry his burden of establishing undue influence, and this finding is amply supported by the evidence.

---

[10] Petitioner spends much time in his opening brief complaining about his attorney's failure to present this evidence at trial, and he cites (albeit without discussion) a federal habeas case (*Zumot v. Borders* (N.D.Cal. 2020) 483 F.Supp.3d 788) in which the petitioner challenged his murder conviction by arguing he received ineffective assistance of counsel. Assuming Petitioner contends he received ineffective assistance of counsel, we note that effective assistance of counsel is a right guaranteed to criminal defendants by the Sixth Amendment to the United States Constitution. (See *Strickland v. Washington* (1984) 466 U.S. 668, 684-686 [6th Amendment guarantees criminal defendant right to effective assistance of counsel].) This is not a criminal case, however, and constitutional rules that apply to criminal prosecutions do not apply here.

*C. The Amount of the Monthly Payment*

We briefly address two arguments Petitioner makes about the amount of the monthly disbursement that do not directly relate to the trial court's findings on capacity or undue influence. First, Petitioner argues the $400 a month figure does not reflect Barbara's intent. This argument is difficult to follow, but appears to go something like this.[11] As evidenced by the terms of the second amendment, Barbara's intent was that Deborah and Barbara Jean would each receive 37.5 percent of the trust estate. According to Petitioner, the trust estate was worth around $700,000 when Barbara died,[12] which

---

[11] We note that most of Petitioner's arguments are perfunctorily asserted without citation to, or discussion of, relevant legal authorities. "A court need not consider an issue where reasoned, substantial argument and citation to supporting authorities are lacking." (*Woods v. Horton* (2008) 167 Cal.App.4th 658, 677.) "We may properly disregard contentions perfunctorily asserted without legal development." (*Cameron v. Sacramento County Employees' Retirement System* (2016) 4 Cal.App.5th 1266, 1282.) "It is the responsibility of the appellant . . . to support claims of error with meaningful argument and citation to authority. [Citations.] . . . [Citations.] In addition, citing cases without any discussion of their application to the present case results in forfeiture." (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52.) Although Petitioner does cite some legal authorities, he never explains their application to this case. Moreover, *all* are inapplicable. This case involves a challenge to a testamentary document filed in California state court, and it is thus governed by California law. Petitioner, however, cites almost no California law. Instead, he cites out-of-state and federal cases and Code of Federal Regulations sections which are inapplicable. Petitioner does cite two California authorities—Penal Code section 118 and Code of Civil Procedure section 631.8—but they are inapplicable as well. Penal Code section 118 is inapplicable because it defines the crime of perjury, and this is not a criminal perjury case. And Code of Civil Procedure section 631.8 is inapplicable because it governs motions for judgment following the close of a party's case in a bench trial, and no such motion was filed in this case. Given this lack of citation to, and discussion of, relevant legal authorities, we would be justified in disregarding most of Petitioner's brief. Nevertheless, because Petitioner is proceeding pro. per., we did not disregard his brief, and we have instead tried to liberally construe it in order to ensure he receives a hearing on the merits. (See *People v. Mitchell, supra*, 209 Cal.App.2d at p. 315.)

[12] Deborah testified the trust estate was worth around $650,000 to $700,000 when her mom died.

25

means each sister's share was around $260,000 dollars. Deborah would receive that amount outright. Barbara Jean, however, would receive only $400 a month, and at that rate it would take over 54 years to disburse her share (and that is assuming the trust assets do not appreciate or earn interest). Barbara Jean was 58 when the second amendment was executed (and around 64 when her mother died), and it would thus always have been impossible for Barbara Jean to receive her full share of the trust estate, which conflicts with her mother's intent that both sisters receive 37.5 percent. Assuming this is indeed Petitioner's argument, we reject it. It is clear from the terms of the second amendment itself that Barbara understood and intended that Barbara Jean might not receive her full 37.5 percent share, because the second amendment provides if Barbara Jean died before her share is fully distributed, the $400 a month would continue to be distributed to her issue (i.e., Daniel). If Barbara had intended to ensure Barbara Jean received her full share of the trust estate, the second amendment would not have included this provision.

Second, Petitioner appears to argue that a reasonable monthly disbursement would be $1,200, because that is what Barbara Jean's $260,000 share of the estate would yield if invested wisely. He supports this argument by citing one of the documents he submitted after the trial was over, but, as discussed above, we cannot consider this document. Moreover, and more importantly, the question in this case is not whether $1,200 would be a reasonable monthly payment given the value of Barbara Jean's share of the estate. The question is whether Barbara lacked capacity to specify a $400 monthly payment and/or Deborah unduly influenced that amount. Again, under California law, Barbara could dispose of her property as she saw fit, without regard to whether the disposition was "appropriate or fair." (*Estate of Sarabia, supra*, 221 Cal.App.3d at p. 604.)

We also note that both of these arguments about the amount of the monthly payment are based on the fact that Barbara's trust estate was worth around $700,000 when she died, which meant Barbara Jean's 37.5 percent share was worth around $260,000. As the trial court noted, however, such arguments are based on hindsight, and

26

ignore the fact that when Barbara executed the second amendment, she did not know what her estate would be worth when she died. Assume, for example, that Barbara had died with $50,000 in assets. In that case, $12,500 would go to Richard outright; $18,750 would go to Deborah outright; and $18,750 would go to Barbara Jean in trust. At the rate of $400 per month, Barbara Jean's share would be distributed in less than four years (perhaps a bit longer if invested wisely), and most of Petitioner's arguments about the amount would simply disappear.

One final note about the $400 amount. The trial court found, "Barbara and Mr. Arel took into account Barbara living to be close to 100, and depleting most of her trust assets, as well as Barbara Jean's savings, retirement and social security, and came up with the sum of $400.00 per month to supplement Barbara Jean's income after Barbara died. Based on these factors, the sum of $400.00 was rational and reasonable." Petitioner challenges this particular finding, and says the evidence "contradicts" it. Why? Because Barbara was not actually likely to live to be 100, and Deborah "misled" or even lied to the judge by suggesting otherwise. Deborah, however, did not testify or otherwise suggest her mother was likely to live to be 100. Instead, she testified her mother told Arel she had aunts and uncles who lived to be 100, and she was planning to live that long. Moreover, and regardless of whether or not Barbara would actually live to be 100, there is nothing unusual or suspicious about assuming a long life when making an estate plan.

## CONCLUSION

We end where we began, by emphasizing the standard of review: "The province of a reviewing court in a will [or trust] contest is identical to its position in any other civil action. All conflicts must be resolved in favor of [Deborah] and all legitimate inferences indulged in to uphold the judgment if possible. When two or more inferences can be reasonably deduced from the facts, the reviewing court lacks power to substitute its deductions for those of the trial judge." (*Estate of Larendon* (1963) 216 Cal.App.2d 14, 19.) "[T]he duty of an appellate court in reviewing a decision in a will [or trust] contest

27

[is] as follows:  'All of the evidence most favorable to the respondent [i.e., Deborah] must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact.  If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.' "  (*Estate of Sauls* (1963) 218 Cal.App.2d 827, 830.)  Here, the evidence so viewed is sufficient as a matter of law.

## DISPOSITION

The judgment is affirmed.  Deborah shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


_____/s/_____
EARL, J.


We concur:


_____/s/_____
ROBIE, Acting P. J.


_____/s/_____
KRAUSE, J.